OF

## CASES ARGUED AND DETERMINED

IN THE

### SUPREME COURT OF ALABAMA,

JANUARY TERM, 1842.

---

OWEN, *et al.* v. THE BRANCH BANK AT MOBILE.

1. The notes issued by the Bank of the State of Alabama and its Branches, are not "bills of credit," within the prohibition of the Constitution of the United States.

Error to the Circuit Court of Mobile.

THIS action was commenced in the Court below, on motion, on a note made to the Bank by the plaintiff in error, for a loan of the notes of the Bank.

The pleas interposed in bar of the action, which are very long, and sufficiently described in the opinion of the Court, present two questions; first, the constitutionality of the charter of the Bank in reference to the constitution of the U. States.— Second, the right of the State, to suspend specie payment, on the part of the Bank.

These pleas being demurred to, the Court below sustained the demurrer, and the defendants pleaded over, and moved the Court to charge the jury in substance, that as the notes of the bank were bills of credit, within the meaning of the prohibition of the constitution of the U. States, the Bank could not recover,

which charge the Court refused to give, and the defendants excepted, and judgment having been rendered in favor of the Bank, the defendants prosecute this writ of error, and now assign for error the judgment of the Court sustaining the demurrer to the pleas, and the refusal to charge, as moved for by the plaintiffs in error.

LESSESNE, for the plaintiffs in error, contended that the notes issued by the Bank were bills of credit, within the meaning of the prohibition of the constitution of the U. States, and insisted that the design was to prevent the States from issuing "*paper money.*" 3 vol. Madison Papers, 1442, 44th No. Federalist, 212. He insisted that the intention of the State Legislature to violate this provision of the constitution, was obvious, from the preamble to the charter of the Bank. Aik. Dig. 55.

He contended that the notes of the Bank were bills of credit, notwithstanding there was a fund provided for their redemption, and although they were not made a legal tender. To prove this, he cited many of the colonial acts, and referred to the opinion of Judge Story, in Briscoe v. The Com. Bank of Kentucky, 11 Peters, 333, and insisted that the constitution could not be evaded by the State, by the appointment of an agent; that the act of the Bank was the act of the State. He cited the case of Craig v. The State of Missouri, 4 Peters, 410, and maintained that that case was not so strong as the present because it was only by implication, that the Court came to the conclusion that the certificates issued by the State were designed to circulate as money, but such was the expressed intention in this case.

He also maintained, that the case of Briscoe v. The Com. Bank of Kentucky, 11 Peters, 257, was an express authority in his favor, and that this was a stronger case than that, in as much as the "faith of the State was pledged for the redemption of the notes of the bank," and because, by an act of the legislature, the State could be sued in her own Courts; the absence of which, in the Kentucky case, was the ground of the decision.

CAMPBELL, contra, contended, that the Bank was constitutional. He argued that it was a task of great difficulty and delicacy, which devolved on the Court. That a Court will not

declare a solemn act of the legislature void, unless it is clearly and plainly so. 3 Dall. 399; 4 ib. 18; 6 Cranch, 128; 9 Yerger, 499; 7 Pick. 466; 13 ib. 60. That in addition to these considerations, in this case, the constitutionality of the Bank had been asserted by the people in their sovereign capacity, by the adoption of the State constitution; that the principle had been asserted by the people of some of the States; by judicial tribunals of high authority; in the opinions of enlightened statesmen; that this accumulated mass of evidence, as to the constitutionality of the Bank was entitled to the greatest weight.— He referred to the decisions of the Supreme Courts of Kentucky and South Carolina, in 2 Littell, 300; 3 Dana 150; 7 J. J. M. 349; 2 McCord, 12; and to those of the Sup. Court of the U. States, 9 Wheat. 904; 2 Peters, 324; 11 ib. 257. He insisted that the Executive and Legislative departments of the General Government had concurred in these conclusions by selecting these institutions as depositories of the public money.

He referred to the opinion of Gen. Hamilton in his report upon the plan of a national bank, in 1797, to show the true meaning of the term *paper money;* and asserted that it was admitted by the opponents of that scheme, as well as by those in favor of it, that the power existed in the States without limitation, to establish banks whose notes were payable in coin; and cited extracts from the speeches of Mr Madison, Mr Jackson, Mr Stone, Mr Giles, Mr Ames, Mr Gerry, and Mr Vining, to establish his position. He also asserted, that in the discussions on the bank bill in 1810, the weight of authority was decidedly in favor of the right of the States to charter banks.

For the history of paper money in the colonies, he referred to Franklin's Works, 2 vol. 340; 8 ib. 115. That the motive for the prohibition in the constitution of the U. States, was the protection of commerce; that commercial intercourse could not be carried on if each State might enforce the circulation of its paper securities. That to prevent that species of legislation so fatal to the harmony of the States and the integrity of contracts; the States covenanted with each other to pass no law impairing the obligation of contracts, or to change the medium of their fulfilment, and that requisition should not be made upon the citizen to receive any medium of circulation having no better support than State authority.

He defined a "bill of credit" to be *a paper circulated as money under the authority of the State, and obligatory on the citizen,* and referred to Mr Madison's letter to C. J. Ingersoll, for the same opinion, from that eminent constitutional lawyer.

He admitted, that as the State could not be sued, that an emission by the State, directly, of Bank bills, would be unconstitutional, but that here was a corporation liable to be sued, and a fund provided for the redemption of the bills.

He maintained that the pledge of the faith of the State was a mere guaranty which could not be injurious; that the privilege of sovereignty was not thereby conferred on the bank, and that the guaranty was not the bill circulated.

That the act of the legislature authorising the suspension of specie payments, did not interfere with the obligation of the contract, but was merely intended to relieve against the penalty of forfeiture in the charter. Aik. Dig. 57; and in the Constitution of the State, Aik. Dig. XIII. § 6, and that the act opposed no obstacle to a suit by any one.

That the question, whether the Bank had not forfeited its charter by commencing business without the proper amount of specie, could only be inquired into in a proceeding to forfeit its charter. 5 Litt. 45; 3 Hawks, 320; 7 Pick. 370; 4 Gill & Johns. 121; 14 Peters, 131; 9 Wend. 351; 10 ib. 266; 16 Mass. 92; 2 Cranch, 128; 2 Conn. Rep. N. S. 30; 7 Ser. & Rawle, 313; 11 ib. 411.

ORMOND, J.—The question presented on this record is, whether the charters of the Bank of the State of Alabama and its Branches, are not in violation of that portion of the first clause of the tenth section of the Constitution of the United States, which fordids a State to "emit bills of credit."

It is admitted by all Courts to be an exceedingly delicate and highly responsible duty to pass upon the constitutionality of an act of the legislature. It is a duty they would willingly avoid, but which, from the structure of our government, with a written organic law, binding on the legislature as the supreme law of the land, they are sometimes called on to perform.— The difficulty in this case, is still further increased from the fact, that the supposed violation of the constituton of the U. States, has been authorised by the people of this State in their

highest sovereign capacity, in the adoption of the State constitution, authorising the establishment of a State Bank; and when to these considerations, is added the further fact, that the people of this State have an enormous pecuniary interest at stake upon the decision, it must be admitted that a task of greater delicacy could not be imposed on any Court.

The rule of conduct to be observed in such cases, cannot be better expressed than in the language of C. J. Marshall, in Fletcher v. Peck, 6 Cranch, 128. "The question, whether a law be void for its repugnancy to the Constitution, is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The Court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implications and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law, should be such that the Judge feels a clear and strong conviction of their incompatibility with each other."

As the violation of constitutional law supposed to exist in this case, is of the constitution of the U. States, our responsibility is greatly abridged by the fact, that our judgment, if wrong, can be rectified by the Federal Judiciary. Indeed, by the examination which this question has already undergone in the Supreme Court of the United States, in the cases of Craig v. The State of Missouri, 4 Peters, 410, and Briscoe v. The Commmonwealths Bank of Kentucky, 11 Peters, 257; our labor is reduced to an examination of the principles decided in these cases; for whatever may be our private opinions, we shall feel it an imperious duty to yield to the authoritative exposition of the constitution of the U. States, made by the Supreme Court.

These decisions are cited, and relied on by the counsel for the plaintiff in error, who maintains that the first cited authority is expressly in point; and that in the last, although the Court affirmed the constitutionality of the charter of the Kentucky Bank, it was upon grounds, and by reasoning, which shows that the Bank of the State of Alabama connot be maintained.

The case of Craig v. The State of Missouri, presented the following facts: By an act of the Legislature of Missouri certicates were authorised to be issued to the amount of two hundred thousand dollars, of denominations not exceeding ten dollars nor less than fifty cents; and were made receivable at the State Treasury in payment of salaries of officers of the State, carrying an interest at the rate of two per cent. A loan office was created for the purpose of lending these certificates to the people of the State. The money arising from the leases of the Salt Springs, and all other debts due the State, was constituted a fund for the redemption of the certificates, and in addition thereto, the faith of the State was pledged for that purpose.

The Court attained the conclusion, that these certificates being issued by a State government, and designed to circulate as money, were "bills of credit," within the meaning of the constitutional prohibition, and that the contract based upon them, was null and void.

The question came again before the Supreme Court, in the case cited from 11 Peters. The Commonwealth's Bank of Kentucky, was a corporation created by, and exclusively the property of the State of Kentucky. The capital of the Bank was two millions of dollars, and consisted of all money to be *afterwards* paid into the Treasury, for the purchase of the vacant land of the State; all moneys received for the purchase of land warrants, and the stock owned by the State, in the Bank of Kentucky, and as the Treasurer of the State received these monies from time to time, he was required to pay them into the Bank. The Bank was authorised to do the ordinary business of a Bank, discount notes, &c., so that its debts were not more than double the amount of its capital.

The President of the Bank was required to report to each session of the Legislature. Its notes were payable in gold and silver, and receivable in payment of taxes and debts due the State. The notes issued by the Bank were in the usual form of Bank notes, and it had the capacity to sue and be sued, to buy and sell property, &c.

By a supplementary act it was declared that the Bank might issue three millions of dollars.

The Court held, that the charter of this Bank, was not a violation of that clause of the constitution of the United States

prohibiting the States from emitting bills of credit; because the notes were not issued by the State but by the corporation. That they were not issued on the faith of the State. That the notes of the Bank were payable on demand, in gold and silver, and a fund provided for their redemption, which was under the control of the President and directors of the Bank. That the holders of the notes could not sue the State, and could look only to the Bank for payment, and had the means of enforcing it.

The conclusion of the Court, was that the case was plainly distinguishable from that of Craig v. The State of Missouri, and indeed, insist that the question had been previously determined, in the case of the Bank of the United States v. The Planters' Bank, 9 Wheaton 904, and the Bank of the Commonwealth of Kentucky v. *Wister and others, 3 Peters 318.*

To institute a comparison between these cases and the case under consideration, it is necessary to look into the charter of the Bank of this State.

At the formation of the constitution of the State, rules were adopted for the creation of Banks, to the following effect:

"One State Bank may be established, with such number of branches, as the General Assembly, may, from time to time deem expedient: *Provided,* that no branch Bank shall be established, nor Bank charter renewed, under the authority of this State, without the concurrence of two-thirds of both houses of the General Assembly, and *provided also,* that not more than one Bank, nor branch Bank, shall be established, nor Bank charter renewed at any one session of the General Assembly, nor shall any Bank or branch Bank be established, or Bank charter renewed, but in conformity with the following rules:

1. At least two-fifths of the capital stock, shall be reserved for the use of the State.

2. A proportion of power in the direction of the Bank shall be reserved to the State, equal at least to its proportion of stock therein.

3. The State and the individual stockholders, shall be liable, respectively, for the debts of the Bank, in proportion to their stock holden therein.

4. The remedy shall be reciprocal for and against the Banks.

5. No Bank shall commence operations until half of the capital stock subscribed for, be actually paid in gold or silver,

which amount shall, in no case, be less than one hundred thousand dollars.

6. In case any Bank or branch Bank, shall neglect or refuse to pay on demand, any bill, note or obligation, issued by the Corporation, according to the promise therein expressed, the holder of any such bill, note or obligation, shall be entitled to receive and recover interest thereon until the same shall be paid, or specie payments are resumed by said Bank, at the rate of twelve per cent. per annum, from the date of such demand, unless the General Assembly shall sanction such suspension of specie payments, and the General Assembly shall have power after such neglect, or refusal, to adopt such measures as they may deem proper, to protect and secure the rights of all concerned. and to declare the charter of such Bank forfeited.

7. After the establishment of a general State Bank, the Bank of this State, now existing, may be admitted as branches thereof, upon such terms as the Legislature and the said Banks may agree, subject nevertheless to the preceding rules. See constitution of Alabama, article 6.

In 1823, The State Bank was established, based upon the actual funds of the State then in the Treasury, and a loan obtained on an issue of State bonds. The preamble to the charter which has been adverted to in argument, is as follows: "whereas it is deemed highly important to provide for the safe and profitable investment of such public funds as may now, or hereafter be in the possession of the State and to secure to the community the benefits as far as may be of an extended and undepreciating currency; Be it therefore enacted, &c."

In 1832, the Bank at Mobile, was established, the capital stock of which was two millions of dollars, procured from the sale of the bonds of the State, created for that purpose.

For the management of the Bank, a President and fourteen directors were to be annually elected by the Legislature, and required to make a report to each session of the Legislature.

The corporation was empowered to do the ordinary business of a Bank; to issue notes of a denomination not less than one dollar, with such devices as they might think proper; to deal in bills of exchange and discount notes, not exceeding particular sums, expressed in the charter.

The Bank was prohibited from owing at any one time, more

17

than twice the amount of its capital over and above money deposited for safe keeping, unless previously authorised by law, to do so, and in such event, the directors consenting to it, were made liable, individually, for such excess: but this provision was not to be so construed, as to prevent the Bank from being liable, and on failure of the Bank to pay, the State, also.

The credit of the State was pledged for the ultimate redemption of the notes of the Bank.

The remedy for collecting debts, was reciprocal for and against the Bank.

The corporation was prohibited from commencing operations, until one half the capital stock was deposited in specie, in its vaults. Aik. Dig. 73.

What then are the points of comparison, between the charter of this Bank and that of the State of Kentucky, and in what do they differ?

In both, a corporation was created for the purpose of banking, not on the credit of the State, but upon a fund provided for that purpose. In both, the corporation so created, had the capacity to sue, and was subject to be sued, and was endowed with all the attributes, necessary to the existence of a corporation. In that case, as in this, the notes were issued not by the State, but by the corporation. There, as here, the Bank was the property of the State, and in that case, as in this, the notes of the Bank were payable on demand, in gold or silver, and a fund provided for that purpose.

It must, however, I think be conceded, that as it regards the fund, provided for the redemption of the paper of the Bank of this State, this case is placed in a much more favorable point of view than that of the Kentucky Bank. For while it cannot be fairly presumed that the State of Kentucky would have granted to private individuals, the privilege of banking upon such a fund as seems to have constituted the capital of the Commonwealth's Bank, the State Bank of Alabama and its branches, were founded upon sound banking principles if any such there be; upon a fund not prospective, or to be created by a loan of the notes of the Bank, but actually provided in gold and silver, and the issues of the Bank restricted within the received established limits.

While it may not be uncharitable to suppose that the State of

Kentucky, was availing herself of her sovereignty, to establish a Bank for her own benefit, upon terms which she would not have granted to her own citizens, the State Banks of Alabama, were founded upon the same principles which must have governed, had the charters been granted to individuals.

There is not, in my opinion, but one conceivable point of difference between the two cases, and that is, that the faith and credit of the State of Alabama is pledged for the ultimate redemption of the notes of her Banks, whilst the charter of the Kentucky Bank is silent upon that point: but this supposed difference is more apparent than real.

What is the faith and credit of a State, and what are its sanctions?

The credit of an individual, is the trust reposed in him by those who deal with him; that he is of ability to meet his engagements; and he is trusted, because through the tribunals of the country, he may be compelled to pay.

The credit of a government, is founded on a belief of its ability to comply with its engagements, and a confidence in its honor, that it will do that voluntarily, which it cannot be compelled to do. As an individual may become responsible upon an implied promise, and be compelled to discharge it, so may a State contract an honorary engagement in the same mode.

If a government creates paper to pass as money, and puts it in circulation, it is as much bound to redeem it without an express pledge to that effect, as if one was made, nor could it possibly obtain circulation without such implication. As there is no difference in reason, or the nature of the thing, between an express or implied pledge of the faith or credit of a government, so neither is there any in law. In either case, the dictates of honor and good faith, would require the State to redeem its pledge, but in neither, could it be enforced by the tribunals of the country. It is therefore my opinion, that there is not a shade of difference between the charters of the Kentucky and the Alabama banks, in this respect.

The mischief sought to be averted by the framers of the constitution in the prohibition that the States should not " emit bills of credit," cannot be evaded by the mere omission of the State, to pledge its faith for their redemption ; nor on the other hand does the guaranty of the State, for an emission of paper, as the representative of money, conclusively stamp such paper

the " bills of credit" forbidden by the constitution. If that were so, then if a State should guaranty the ultimate payment of the notes of a corporation in which it had no interest, and with which it had no connection, such guarantee, would *ipso facto,* convert the notes into the " bills of credit" which the constitution forbids; a proposition which will scarcely be contended for.

However difficult it may now be to define the term "bill of credit," as employed in the constitution, a reference to the contemporaneous history of those times, will show beyond a doubt, what was the evil intended to be remedied.

Dr. Franklin, in a vindication of the paper money system of the Colonies, written in 1764, in answer to a report of the board of trade of Great Britain, in which it had been assailed, defends the practice of the Colonies, upon the ground of necessity. In his defence, he shows that it was what it was called by him " paper bills of credit," having no other basis than the credit of the Colony, which issued it, for its support. He was thoroughly acquainted with the subject, and no where speaks of any actual existing fund for the redemption of the paper thus issued, but on the contrary, speaks of it as a *substitute* for the precious metals, and not as their representative, (Sparks Life of Franklin, 2 vol. 340.)

Mr. Madison, in the 44 number of the Federalist, speaks of the prohibition we are now considering, as intended to deprive the States of the power to emit *paper money, as a substitute for coin.*

Gen. Hamilton, in his celebrated report to Congress, in 1790, advising the charter of a Bank of the U. States, shows, with great clearness, the difference between the " bills of credit" forbidden by the constitution, and the issues of a Bank. He says: " The emitting of *paper money,* by the authority of government, is wisely prohibited to the individual States, by the national constitution, and the spirit of the prohibition, ought not to be disregarded by the government of the U. States. Though paper emissions under a general authority, might have some advantages, not applicable, and be free from some disadvantages which are applicable to the like emissions by the States, separately, yet they are of a nature so liable to abuse, and it may even be affirmed so certain of being abused, that the wisdom of government will be shown in never trusting itself with the

use of so seducing and dangerous an expedient. In times of tranquility, it might have no ill consequence; it might even perhaps, be managed in a way to be productive of good; but in great and trying emergencies, there is almost a moral certainty of its becoming mischievous. The stamping of paper is an operation, so much easier than the laying of taxes, that a government, in the practice of paper emissions, would rarely fail, in any such emergency, to indulge itself too far, in the employment of that resource, to avoid as much as possible, one less auspicious to present popularity. If it should not even be carried so far as to be rendered an absolute bubble, it would at least, be likely to be extended to a degree, which would occasion an inflated and artificial state of things, incompatible with the regular and prosperous course of the political economy.

"Among other material differences between a *paper currency,* issued by mere authority of government, and one issued by a *Bank, payable in coin,* is this : that in the first case, there is no standard to which an appeal can be made as to the quantity which will only satisfy or which will surcharge the circulation: in the last, that standard results from the demand. If more should be issued than is necessary, it will return upon the Bank. Its emissions, as elsewhere intimated, must always be in a compound ratio to the fund and the demand, whence it is evident that there is a limitation in the nature of the thing; while the discretion of the government is the only measure of the extent of the emissions by its own authority. This consideration further illustrates the danger of emissions of that sort, and the preference which is due to Bank paper."

This is evidence of the meaning of the phrase, of the very highest authority, and is conclusive, to show that in the opinion of the writer, *bank notes payable in coin,* were not the " bills of credit" spoken of in the constitution, on the contrary, while he adverts to the power of the general government to issue " bills of credit," he insists that it should not be exercised, at the same time, setting forth the advantages to result from the establishment of a Bank, whose notes were payable in coin.

The evil then, designed to be prevented, was the emission by the States, *of paper money,* properly so called, issued by the mere authority of the government, and resting for support, on the credit of the government. That this was the mischief

intended to be prevented, has been shown by the contemporaneous exposition of this clause of the constitution, by the leading actors in the great drama of the Revolution. If further authority were wanting, it would be found in the fact, that the State Banks of this, and some other States, had no prototypes in Colonial history, from the sad lessons of which the propriety of the prohibition was defended.

Thus, Mr. Madison, in the 44th number of the Federalist, says, " that the guilt, consequent on the issues of paper money, by the Colonies, can be expiated no otherwise, than by a voluntary sacrifice on the altar of justice, of the power which has been the instrument of it."

It may be added, that every argument which can be urged against the constitutionality of a Bank owned by the State, but managed by a corporation, liable to suit, and provided with a sufficient fund for the redemption of its notes, applies with equal force to the individual banking companies created by the States. The notes of the former, are at most, not more liable to become the substitute, instead of the representative of coin, than those of the latter, and in both, the right exists to compel a payment in coin, which in both cases, is beyond the reach of the Legislature. It will follow therefore, beyond doubt or cavil, that if the prohibition of the constitution, upon the States, "to emit bills of credit," is to be understood as prohibiting the emission of *paper money*, in its largest sense, not as the substitute, but as the representative of coin; then, as the States cannot do indirectly, what the constitution forbids to be done directly, no power would exist in the States to charter an individual Bank.

The case of Briscoe v. The Commonwealth's Bank of Kentucky, determines that a State may engage in the business of banking through the medium of a corporation, having provided a fund for the redemption of the notes of the Bank. This being conceded, it is impossible to suppose that the mere guaranty of the State, will render the act unconstitutional, as it would be a mere promise to do that which there would be high moral obligation on the State to perform, without such promise. The prohibition of the constitution, is levelled, not at names, but at things, and it is inconceivable, that it should be constitutional for the State to engage in banking, only on condition that it did not promise to redeem the notes of the Bank established by it,

Owen, *et al. v.* The Branch Bank at Mobile.

in the event of the failure of the fund provided for that purpose·

In discussing this branch of the question, in the case of Briscoe v. The Commonwealth's Bank of Kentucky, Mr. Justice McLean, asks: "were they (the notes of the Bank) issued on the faith of the State."

"The notes (he says, in reply) contain no pledge of the faith of the State in any form. They purport to have been issued on the credit of the funds of the Bank, and must have been so received in the community."

Although the absence of these characteristics in the notes of the Commonwealth's Bank, may have been a persuasive answer to the question propounded by the learned Judge, it by no means follows as a consequence, that if the faith of the State had been pledged for the ultimate redemption of the notes of the Bank, that they would therefore have been issued on the faith of the State; as in that case, there was a fund for the payment of the notes; so in this, a fund was provided for the redemption of the notes entirely adequate, or at least would have been so considered, in the case of a private stock Bank. The guaranty of the State was wholly unnecessary, and in point of fact, added nothing to the credit of the institution, or its ability to meet its engagements. The paper of the Bank did not circulate on the credit of the State, but because it was redeemable in coin, on demand, at the counter of the Bank.

It may be true, and probably is, that more confidence is felt in the notes of this institution, than if it were not connected with the State, because the faith of the State is a pledge of a higher character than individuals could give; but for the reasons already given, that circumstance could not affect the charter of the Bank.

It has been strongly urged, that by the law of this State, the State may be sued in her own courts; Aik. Dig. 282—and that therefore, a leading argument in the case of Briscoe v. The Commonwealth's Bank of Kentucky, fails in this case.

It is true, that the constitution of this State, required the General Assembly to direct in what courts suit may be brought against the State—Art. 6, sec. 9. Pursuant to this requisition, the Legislature passed the act referred to, authorising "the citizens or inhabitants of this State," to institute suits against the State, and requiring the Comptroller to draw his warrant

for the amount of any judgment obtained against the State, in favor of the plaintiff, on the State Treasurer.  The obvious design of this law, was to enable those who had claims against the State, to have their justice and amount ascertained in a cheaper and more expeditious tribunal than was afforded by the Legislature itself; but this is a mere permission, an act of grace, which may be withheld, at any time by a repeal of the act, and besides, applies only to our own citizens.  It cannot be, that the constitutionality of the charter of the Bank depends on the will of the Legislature, by suffering this act to remain on the statute book, or that the charter of the Bank can be constitutional, as it regards non-residents, and unconstitutional as to our own citizens.  When it is said that a State cannot be sued, the meaning is, that a suit would be fruitless, as there is no means of enforcing a judgment against a sovereign State. The law of this State, authorising the State to be sued, would become a dead letter, if the State omitted to place funds in the possession of its Treasurer, to satisfy judgments against it: as has already been stated, the pledge of the faith of the State, is a mere honorary obligation of no legal force or validity—no matter how binding in law, in conscience, or in morals, may be the promise, its performance must depend on the mere volition of the body politic.

The preamble to the charter of the State Bank, was also relied on, as showing either a profound ignorance of constitutional law, or as evidence of an express design to violate the constitution of the United States.  It sets forth that it is deemed highly important to provide for the safe and profitable investment of the public funds, and to secure to the community, the benefits, as far as may be, of an extended and undepreciating currency.  It is the last member of the sentence, which encountered the special rebuke of counsel.

When this State came into existance, Banks were established in all the States, and bank notes, generally convertible into coin constituted the currency of this, as well as other States of the Union.

The system was established, and the question was not whether it was beneficial, but how it could be best regulated.  It is not now, if it ever has been seriously denied, that the States have the power to charter Banks; whether Congress possesses

that power, has been fircely contested, and cannot be considered as a settled question, notwithstanding the decisions of the Suprme Court of the United States affirming the right. No one however contends, that Congress can directly interfere with the State authorities, in the creation or management of the State banking institutions. If then, the power to regulate and control the Banks, which is but another phrase for regulating the currency, does not exist in the States, it exists no where; a proposition which cannot be admitted. Among all the anomolies supposed to exist in, or flow from, the peculiar structure of our Federal and State governments, this is the strangest.

When the first Bank of the United States was chartered in 1790, a powerful argument against the proposed Bank by Mr. Madison, Mr. Jackson, Mr. Stone, Mr. Giles and other eminent men, was, that it would interfere with the right of the States to establish Banks; whilst on the other hand, the advocates of the Bank, distinctly admitted the right of the States. After the bill passed, President Washington, referred to his cabinet for their opinions. Mr. Jefferson, who denied the power of Congress to charter the Bank, insisted that the State institutions were sufficient for the fiscal purposes of the government; whilst Hamilton, who denied the sufficiency of the State institutions, explicitly admitted the right of the States. He says: "It has been stated as an auxilliary test of constitutional authority, to try whether it abridges any pre-existing right of any State, or any individual. The proposed measure will stand the most severe examination, on this point. Each State may still erect as many Banks as it pleases; every individual may still carry on the business of banking, to any extent he pleases."

These eminent men, were fresh from the creation of the constitution of the United States, and most of them had an agency in it ; their opinions are of the highest authority, and show conclusively, that the States, by relinquishing the right to "emit bills of credit, to coin money, or to make any thing but gold and silver coin a tender, in payment of debts," did not preclude themselves from regulating the *currency*, so far as that was to be accomplished by the establishment or regulation of banks.

Whether the plan adopted for this purpose, in this and some other States, of securing an efficient control over the currency

by becoming the proprietor, in whole, or in part, of the Banks, is the best which can be devised, as it is an experiment, time alone can develope; but that the preservation of an undepreciating currency, while it consists of bank notes, payable in coin, or which profess to be so payable, is one of the very highest duties of the State governments, is a proposition which cannot be seriously doubted.

The act of 1837, legalizing the suspension of specie payments by the Banks, was merely intended to prevent a forfeiture of their charters, and to save them from the effects of the penalty consequent upon the refusal to pay specie on demand. It was not intended to prevent any one who thought proper, from suing the Bank, and recovering his debt in specie; nor, if such had been the intention, would the law have been obligatory. It is, however, doing great injustice to the Legislature, to suppose any such consequence, as having been contemplated by it in the passage of the law.

In the examination of this case, I have not entered into the consideration of any point presented on the record previously decided by the Supreme Court of the U. States, further, than to show its application to this case, or its want of application. I am perfectly satisfied that the decision made by that Court in the case of Briscoe v. The Commonwealth's Bank of Kentucky, (11 Peters, 257,) covers the entire ground of this case. It is the province of that Court authoritatively to decide all questions arising under the constitution of the U. States, and it is the duty of the State Courts, to yield obedience ; but were it a matter of doubt, we should still feel it our duty so to decide, as the constitutionality of the charter of the Bank, has not only been approved by the Legislature, but was authorised by the people of the State, acting in their sovereign capacity.

It remains but to add, that it is the unanimous opinion of the Court, that there is no error in the judgment of the Court below, and it is therefore affirmed.

COLLIER C. J.—If the question raised in this cause, could be regarded as *res integra,* I should take occasion to express my views at large, but I consider it as so conclusively settled as scarcely to admit of serious disputation. The interpretation of the Federal constitution, by statesmen of every political

caste, who lived nearest the period of its adoption, conceded to the legislatures of the States, the right to incorporate Banks, with authority to emit their bills, or notes, as the representative of money. Every department of the State governments have recognized the right as unquestionable. And the Supreme Court of the United States, the tribunal of the last resort for the protection of the Federal constitution, where an aggression has been made in such manner as to authorize the interference of the judiciary, have again and again declared that the power is not inhibited to the States. Under the influence of authority so resistless, I can but declare my acquiescence in the opinion of my brother ORMOND.