Rodman *v.* Munson.

---◇---

## RODMAN *vs.* MUNSON.

The act of the legislature passed July 10, 1851, entitled " An act to provide for the completion of the Erie canal enlargement, and the Genesee valley and Black river canals," is inoperative and void, as being repugnant to, and in violation of, the provisions of the 7th article of the constitution.

And the certificates, called " canal revenue certificates," issued by the comptroller, under and by virtue of the second section of that act, are wholly null and void, and without any pecuniary value.

Money advanced to a state, at its own request, and applied to its own use, upon a written contract that it shall be repaid, with the interest, from the proceeds of the sales of its public domain, or from the proceeds of any other specific branch of its revenue, and from no other source whatever, creates a *debt*, within the legal as well as the universal sense of the term. *Per* BROWN, J.

Whether the obligation to repay, in such a case, is general or special—whether the contract is to pay from one or from all the resources at the command of the state—it cannot be regarded otherwise than as one that imposes a duty, and creates a debt.

Powers and trusts to be executed at, or after, a given time, cannot be legally executed before the time. Upon this principle the legislature cannot assume to execute the trust confided to it by the people in regard to the com-

Rodman *v.* Munson.

pletion of the canals, and the application of the canal revenues, in antici-
pation of the time expressly designated in the constitution which creates
the power and confers the trust.

DEMURRER to answer. The complaint alledged that on the
23d of January, 1852, the defendant made his promissory note,
of that date, by which he promised to pay J. Watson Williams
on order, on the 1st day of February then next, $515 at the
Bank of the State of New-York, for value received; that Wil-
liams indorsed such note and the plaintiff was the lawful holder
and owner thereof, for a valuable consideration, and that no part
had been paid. And the plaintiff demanded judgment for the
amount of the note and interest; with costs. The defendant,
by his answer, admitted that he made the promissory note as
stated and set forth in the complaint, that the same was indorsed
by the payee, and that the plaintiff was the lawful holder and
owner thereof. But he alledged, on information and belief, that
the plaintiff became the purchaser, holder and owner of said
note, on or about the 6th of February, 1852, and after the same
had become due. He admitted that no part of the note had
been paid, but he alledged that the plaintiff ought not to main-
tain his action against the defendant because said note was
made, executed and delivered by the defendant, in consideration
of the sale and assignment to him of a certain instrument in
writing, commonly called a canal revenue certificate, which was
thereinafter more particularly mentioned and described, and for
no other consideration whatever. The defendant further al-
ledged, that the said instrument called a canal revenue certifi-
cate, was for the payment of five hundred dollars, and was made
and issued by the comptroller of the state of New-York, in the
form prescribed in the second section of the act, chapter 485,
of the session laws of 1851, and of the act therein referred to,
passed in the year eighteen hundred and thirty-one, and which
certificate was signed by the comptroller of the state officially,
and countersigned by the transfer agent appointed by him, and
purported on its face to be made and issued by the said comp-
troller, under the authority of an act of the legislature of said
state, entitled "an act to provide for the completion of the Erie

canal enlargement, and the Genesee Valley and Black river canals," passed the 10th day of July, 1851; and in and by said certificate it was certified and stated that the person named therein, and his assigns, were entitled to receive five hundred dollars on the first day of July, 1866, and the interest thereon at the rate of six per cent per annum, semi-annually, on the first day of January and the first day of July in each year, until the time when the principal sum would be receivable at New-York, as provided in the said act, without any other obligation, liability or pledge on the part of the state of New-York, than such as is contained in the said act. And the defendant averred that said canal revenue certificate, so sold and assigned to him, and for the assignment of which to him, the promissory note set forth in the plaintiff's complaint was given by the defendant as aforesaid, was wholly null and void; that the comptroller had no lawful power or authority to issue the same; that it does not convey or give to the holder and owner thereof, any right or title to any portion of the remainders of the revenues of the canals of this state, mentioned or referred to in section three, article seven, of the constitution, or any of the revenues or moneys derivable from said canals, or any valid or legal claim against this state for the payment of the money mentioned in said canal revenue certificate, or any part thereof; and that the supposed act of the legislature mentioned and referred to in said certificate, and which is the said act, chapter 485, as published in the volume printed under the direction of the secretary of state, pursuant to the statute in such case made and provided, and under and by virtue of which the said canal revenue certificate purports to have been issued, and upon pretense of which the defendant admitted the same was issued, was repugnant to and in violation of the provisions of the seventh article of the constitution of this state, and was utterly null and void; and so the defendant averred and insisted that the promissory note so given by him as aforesaid, was given without any valuable consideration therefor, and that the said plaintiff ought not to have or maintain his said action thereon against the defendant for the recovery thereof.

To the whole of this answer the plaintiff demurred generally, on the ground that the matters and things therein stated were not sufficient in law to bar the cause of action set forth in his complaint.

*Thomas H. Rodman,* plaintiff in person.

*H. Denio,* for the defendant.

BROWN, J. This cause comes before the court upon a demurrer, and under the rule which requires such issues to be first heard at a special term. The answer asserts that the only equivalent for the note which the plaintiff seeks to recover, was a canal revenue certificate, for the sum of $500, and that it was negotiated and passed to the plaintiff after it became due and payable. These facts are admitted by the demurrer to be true. Any good defense which the defendant had to the note in the hands of the payee, he may now urge against it in the hands of the present holder. If the certificate is void and without pecuniary value, then the note is without consideration, and its payment cannot be enforced. (*Parish* v. *Stone,* 14 *Pick.* 198, 217. *Bank of Troy* v. *Topping,* 9 *Wend.* 273. *Slade* v. *Halstead,* 7 *Cowen,* 322, *and the cases there cited.*) And we are thus brought to consider whether the certificate had any real or actual value, and whether the legislature had authority to pass the law under which it was issued. For all the purposes of this argument, the authority must be assumed in the first instance, because the legislative power extends over all the known and recognized subjects of municipal regulation, unless restrained by some positive rule of the fundamental law. Those, therefore, who put the legislative authority in controversy, take upon themselves the burthen of showing the limitation or prohibition.

The fundamental principle of the English constitution, that the power and jurisdiction of the legislature " is so transcendent and absolute, that it cannot be confined for causes or persons within any bounds," does not obtain in this state. Written con-

Rodman v. Munson.

stitutions are framed with a double purpose : to furnish a scheme or plan of government, and to define and limit the powers of those who are to govern. They not only declare of what the government shall consist ; into what departments it shall be separated ; how its powers shall be distributed ; how and when, and for what periods of time, the public authority shall be delegated ; and in what manner the several departments shall proceed to the exercise of their functions : but they also prescribe the exact confines within which these functions shall be exerted ; over what subjects they may or may not extend, and the degree of power, absolute or limited, which each department may exert. The power to charge the property or revenues of the state, or the property and productive industry of its people, with the payment of large debts at a future day, has constantly been regarded with hostility and distrust, because it is a power pregnant with danger, and prone to the most dangerous abuses. Except to the extent and for the purposes authorized by the 10th and 11th sections of the 7th article of the constitution, "the dangerous power of providing for the necessities, and maintaining the influence of present times, by borrowing money and laying its payment on posterity," has been denied to the legislature. If it shall appear, upon examination, that the million and a half already obtained, and the seven millions and a half which it is proposed to obtain under the act of the 10th of July, 1851, for the completion of the Erie canal enlargement, and the Genesee Valley and Black river canals, is, or will be in fact, a debt against the property or the revenues of the state, it will then be within the prohibition of section 12, of article 7, of the constitution, and the duty of the courts will be too plain to be evaded or misunderstood. They can do no less than to pronounce the law under which it is created inoperative and void, and the certificates which are the written evidences of it, of no real or actual value, and imposing no legal obligations upon those who may administer the government of the state. Written constitutions will become of little value when the limitations they impose upon legislative power can be evaded or transcended. To what purpose are such limitations, if those limits may at any

Rodman *v.* Munson.

time be passed? The distinction between a government with limited and unlimited powers, is abolished if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation. If the constitution does not control any legislative act repugnant to it, then the legislature may alter the constitution by an ordinary act. The theory of every government with a written constitution forming the fundamental and paramount law of the state, must be, that an act of the legislature repugnant to the constitution is void. If void, it cannot bind the courts and oblige them to give it effect, for this would be to overthrow in fact what was established in theory, and to make that operative as law which is not law. .It is the province and the duty of the judicial department to say what the law is, and if two laws conflict with each other, to decide on the operation of each. So if the law be in opposition to the constitution, and both apply to a particular case, the court must decide the case conformably to the law, disregarding the constitution, or conformably to the constitution, disregarding the law. If the constitution be superior to the act of the legislature, the courts must decide between the conflicting rules. And how can they close their eyes on the constitution and see only the law? (*Chief Justice Marshall, in Marbury* v. *Maddison,* 1 *Cranch,* 137. 1 *Kent's Com.* 453.)

By the 10th section of the 7th article of the constitution, "the state may, to meet casual deficits or failures of revenue, or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed one million of dollars." By the 11th section of the same article, the state may also in addition contract debts to repel invasion, suppress insurrection, or defend the state in time of war. And section 12 expressly declares that no other debts "shall be thereafter contracted by, or on behalf of the state, unless such debts shall be authorized by a law for some single work or object to be distinctly specified therein, and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within

18 years from the time of the contracting thereof. Nor shall such law take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for or against it at such election." The legislature possesses no other power to create or contract debts of any description, except such as is found in the three sections to which I have referred. Here will be found the well-defined rule by which legislative authority may know at what time, to what extent, for which specific purposes it may charge the revenues or property of the state, or the property and industry of its people, with debts payable at a future time. It is clear, therefore, that if the effect of the law of July 10th, 1851, is to create a debt within the legal and ordinary sense of that term, it does that which the constitution expressly prohibits, and in a conflict between the statute and the fundamental law, the latter must prevail.

The 2d section of the act directs the comptroller to prepare certain certificates, to be denominated "canal revenue certificates," in the manner specified in the 2d section of the act of 1831, in regard to the public stocks of the state, for any sums of money not less than $50. They are to be signed by the comptroller officially, and countersigned by any transfer agent appointed by him. They shall be made payable at such times —not exceeding twenty-one years from the date of their issue— as the comptroller shall designate, and bear an interest not exceeding six per cent, payable semi-annually, on such days and in such places as the comptroller shall direct. All the existing provisions of law in relation to certificates of stock issued by the commissioners of the canal fund, so far as they are applicable, shall extend to and be applied to such canal revenue certificates, and in respect thereto the comptroller shall perform the duties and possess the power which such commissioners possess and perform in respect to certificates of stock. Such canal revenue certificates shall also purport on their face to be issued by virtue of such act, and without any other liability or pledge on the part of the state, than such as is contained in the said act, of the surplus revenues of the canals, and they are to be redeemed, and

the interest thereon is to be satisfied, as provided in such act. By the 7th section the comptroller is required to sell canal certificates to the extent of three millions of dollars·the first year, three millions the second year, and not exceeding three millions of dollars in value the third year after the passage of the act. By the 8th section he is required to pay the proceeds of the sales into the treasury of the state, to be applied exclusively to the completion of the Erie canal enlargement, and the Genesee Valley and Black river canals, and to the payment of the interest on such certificates—which 8th section in terms makes the appropriation for those objects. The first and second year's interest upon the certificates is, by the 9th section, to be paid from the proceeds of the sales ; and after the close of the fiscal year 1854, or at such earlier period as the said enlargement and canals shall be completed, the whole of the remainders of the canal revenues which shall remain after paying the several sums required by the constitution for the extinguishment of the canal debt, the general fund debt, and for the necessary expenses of the government, is, by the 3d section of the act, devoted to create a separate fund, for the payment of the interest and for the redemption of the principal of the canal revenue certificates. Provision is also made by the 4th section for keeping the proper accounts of such funds and remainders separate and distinct from the other funds of the state, and for the payment of interest on such canal certificates, and for redeeming the same as they shall become redeemable, by the warrant of the comptroller to be drawn on the treasurer, payable out of such fund. The 11th section imposes upon the canal board the duty of adjusting the rates of toll upon all articles transported on the canals, so as to produce the greatest amount of trade and revenue until otherwise directed by the legislature. And section 14 declares that the state shall in no event be liable to make up any deficiency in the canal revenue, or to redeem the certificates from any other source than the canal revenues, as directed by the act. These are, substantially, all the provisions of the statute which affect the question now to be considered, and from them we are to ascertain the nature and extent of the obligations which it will

Rodman *v.* Munson.

impose upon the state, and whether the money obtained and to be obtained under it is to be regarded as a debt, within the legal signification of that term

What then is the character of the transaction between the purchasers of the certificates and the state, and what is the relation which the contracting parties maintain towards each other? In one of the printed arguments to which I have been referred, it is said the act " asks no loan, invites no deposit, which in its terms creates a primary obligation to return what is deposited; but it provides for the sale of an article, of the right to receive certain moneys expected to accrue from a specified source, a sale for such a price as the purchaser chooses to give, not below a certain rate, without warranty or stipulation of any kind creating any obligation on the part of the vendor." If this be a true exposition of the effect of the law—if the holders of the certificates have really and truly become the purchasers of the remainders of the canal revenues, then it certainly does not create a debt; because a mere sale implies no obligation on the part of the vendor, except a warranty of title in the thing sold. And without an obligation there is no debt. " Sale is the transmutation of property from one man to another, in consideration of some price or recompense in value." . The right of property in the subject of the sale passes from the vendor to the purchaser, and the right to the purchase money vests absolutely in the vendor. The same results follow a sale with the option to re-purchase at the same or a different price. Neither of these consequences ensue from the advance of the money upon the canal certificates. The right of property in the canal remainders does not vest in the purchasers of the certificates, and the right to the money does not vest absolutely in the state. The subject of the sale— if there be a sale—is the remainders of the canal revenues. And the law, and the sale of the certificates in conformity with the law, does not effect a sale of the remainders, because, 1. The purchasers have no common interest in the property alledged to be purchased. Each purchaser buys for himself, separately and independently of all others. Sales to the value of three millions have been effected. A sale of three millions more is to be effect-

ed in 1852, and a sale of not over three millions in addition is to take place in 1853 : so that if it can be denominated a sale of the remainders, it is marked by this novel and unusual feature, that the sales are to be opened from time to time to let in new purchasers. 2. The 7th section of the act enjoins it upon the comptroller to sell the canal revenue certificates, and not the remainders of the canal revenues. The state is to manage and control the canals, and collect the revenues and tolls as heretofore, and the remainders are not to be delivered over to the pretended purchasers as their property : but by the provisions of the 3d section, such remainders, "as the same shall be ascertained at the end of each fiscal year, shall constitute a separate fund for, and be applied to, the payment of the interest on said canal revenue certificates so issued by the comptroller, as the same shall fall due, and to the redemption of the said certificates, as they shall become redeemable." 3. By the terms of the contract as collected from the act, and as expressed in the certificates, the money advanced is not treated as purchase money for an article or chose in action sold, which is to vest in the vendor. It is to be repaid, with the interest, out of the canal remainders, and when repaid, the interest of the pretended purchases ceases. 4. The 6th section of article 7 of the constitution declares " that the legislature shall not sell, lease, or otherwise dispose of, any of the canals of the state, but the same shall remain the property of the state, and under its management forever." " Sell, lease, or otherwise dispose of," are words of most comprehensive signification. Coupled with the affirmation that the canals " shall remain the property of the state, and under its management forever," the section cannot be regarded otherwise than an absolute prohibition of any sale, pledge or mortgage of the canals by the state, or of any interest, income or revenue issuing therefrom. The act under consideration has no single sentence indicating an intention to part with the right of property, or with any interest in the remainders of the canal revenues, further than to apply them to the creation of a fund sufficient for the payment of the interest and the ultimate redemption of the principal moneys mentioned in the certificates. If

the state was, like an individual, subject to an action in the courts, and there were no constitutional obstacles in the way, the holders might successfully assert their right to have the trust executed and the remainders applied to create the fund indicated, and ultimately paid over in satisfaction of the principal and interest moneys mentioned in the certificates. But this is the utmost they could do. The idea of a sale is foreign to the transaction, and positively forbidden by the 6th section of the 7th article above quoted.

In the printed points and argument furnished upon the hearing, it is also intimated that the transaction may be regarded as a mortgage of the remainders of the canal revenues, and that " when a mortgage is given without any covenant or engagement to pay, no debt is created, and the only remedy is on the property mortgaged." The legal principle cannot be disputed, but the authorities cited to sustain it go very far, I think, to show that the contract under consideration lacks all the distinguishing features of such a mortgage. *Culver* v. *Sisson*, (3 *Comst.* 264,) was an action upon a chattel mortgage which transferred to the plaintiff certain goods and chattels for the purpose of securing the payment of the sum of $345,70, and to be void on payment of the money at a certain day, with authority in the event of nonpayment to sell and apply the proceeds to the payment of the money, rendering the overplus to the defendant. The court held that the plaintiff could not recover, because there was no acknowledgment of indebtedness, and no agreement, express or implied, to pay the money. That the mortgage might have been given to secure " the debt of another, without intending to become personally bound for its payment." In *Salisbury* v. *Phillips*, (10 *John.* 57,) Jacob Phillips, for the consideration of £12, assigned and transferred to Abraham Salisbury a lease, together with all his interest in the lands demised, with a condition annexed, that upon payment of the £12, with the interest, at the time appointed, the assignment should be void. The money was not paid, and the action was brought to recover it, with the interest. Judgment was rendered for the defendant, the court saying the condition was exclusively for the benefit of the as-

signor, and there was no covenant for the payment of the money. *Suffeild* v. *Baskerville*, (2 *Mod.* 36,) and *Briscoe* v. *King*, (*Cro. Jac.* 281,) are cases similar in all respects with that of *Salisbury* v. *Phillips*. In *Elder* v. *Rouse*, (15 *Wend.* 218,) the instrument upon which the plaintiff claimed to recover, was a chattel mortgage. It recited that the defendant was indebted to the plaintiff in the sum of $100, and then transferred the chattels as security for its payment by a given day, with the interest, and with the usual condition to be void on payment of the money, and in case of non-payment, the plaintiff was to sell and apply the proceeds of the sale to the satisfaction of the debt. The court gave judgment for the plaintiff, and affirmed the rule that where one person acknowledges, by deed or otherwise, a certain sum due to another, an action will lie to recover it; that the acknowledgment of the indebtedness itself creates a legal liability sufficient to sustain the action. It will be seen that these cases are in harmony with each other. The four first assert the principle that a mortgage of chattels or lands given without any acknowledgment of indebtedness, or covenant or engagement to pay, creates no debt, and the last declares with equal emphasis, that a similar instrument, with an acknowledgment of an indebtedness by the mortgagor, is equivalent to a formal promise, and does create a legal liability to pay, sufficient to sustain an action. If these authorities have any effect to determine the nature of the contract which the state has made with the purchasers of the canal certificates, their tendency must be to show that it has assumed an obligation and incurred a liability in regard to the repayment of the money from a specific portion of its revenues, which cannot be regarded and treated otherwise than as a debt. There is an express promise to pay from the remainders of the canal revenues.

It is worthy of remark, that when the state proceeds to borrow money and contract a debt, the process is in all respects similar to that by which the money has been obtained upon the canal revenue certificates. The law creates the stock, and the certificates are sold in the market. They are signed by one or more of the officers of the government, are subject to transfer

Rodman *v.* Munson.

from hand to hand, designate the amount of the principal and when redeemable, the rate of the interest and when and where payable, and not unfrequently the sources or specific revenues upon which its payment is primarily secured. The obligation to pay is not usually limited upon any specific fund or particular source of revenue, nor dependent upon any future contingency. The payment of the money obtained upon the canal revenue certificates, is limited upon the specific fund to be created out of the remainders of the canal revenues, and made to depend solely upon its sufficiency. If there is any other distinction between the obligation created upon a sale of the stock of the state to procure money for any particular object, or that created upon a sale of certificates to procure money for the completion of the canals, the argument has failed to indicate what the distinction is.

The purchase of the canal revenue certificates has all the essential properties of a loan of money, and none of the properties of a purchase of the remainders of the canal revenues. The holders of the certificates have advanced their money to the state, at the request of the state, to be applied to the uses of the state. In return they have received—not a written conveyance or instrument of title to the canal remainders—but a written evidence of the sums advanced, signed by the chief financial officer of the government, acknowledging that it is to be repaid, and specifying the time when, and the public fund out of which it is payable. It does more than this : It declares that a compensation shall be paid for the use of the money advanced, part of it out of the principal sums advanced, and the residue out of the fund created by the remainders of the canal revenues ; and it determines the times when this compensation is also payable. The payment of usance or interest at given times, and at a given rate, is one of the unerring tests of a loan of money. A loan is said to be that which is furnished for temporary use, with a condition that it shall be returned, or its equivalent, with a compensation for the use. The thing furnished is the money mentioned in the certificates ; the time is the twenty-one years from the date when it is to be returned ; and the compensation for the use is the six per cent, payable semi-annually. It is possible that

the specific fund upon which the repayment of these moneys is chargeable may fail, and the holders may be held to their engagement not to seek payment elsewhere, but it is nevertheless a loan of money to the state, to be applied to its own uses, with concurrent obligations and duties in regard to its repayment, from which the state cannot justly relieve itself until it is repaid, with the interest, or the particular fund or source of revenue upon which it is a charge shall decay and altogether fail. The presence of interest in the transaction is a feature of most significant import. Interest proceeds from money or property lent by one person to another, or from debts, legacies or sums of money due or to grow due and payable from one person to another. Whenever there is interest payable, there exists a corresponding obligation, somewhere, to pay it. " Interest is the sum paid by the borrower of a sum of money, or of some sort of valuable produce, to the lender for its use." (2 *McCullough's Com. Dic.* 96.) Interest is the " premium paid for the use of money; the profit per cent derived from money lent, or property used by another person, or from debts remaining unpaid." ( *Webster's Dic.*) " Where money is lent on a contract to receive not only the principal sum again, but also an increase by way of compensation for its use, it is called interest by those who think it lawful, and usury by those who do not. (2 *Black. Com.* 454.) These definitions sufficiently disclose what interest is, and from whence it proceeds; that it imports the existence of a debt, a loan of property, or a sum of money out of which it is to issue, and for the use or withholding of which it is to become payable; and it also imports the existence of some obligation or duty in regard to the payment of the principal. The certificates declare that the persons advancing the money are entitled to receive interest thereon half yearly, until the time when the sums advanced are redeemable. For what considerations are these persons to receive this interest periodically from the public treasury? In consideration that the state has the use of their money, and upon no other consideration that has yet been named. The money is paid over to the state at its request and applied to its use. There is an agreement to pay the

interest regularly, and repay the principal at an appointed time. If it is not a loan, what is it? It is not a gift. It is not a mere deposit for safe keeping, at the risk of the depositor. It is not the payment of a precedent or a present debt. Nor is it, as has been seen, the consideration money for property purchased, for each of these dispositions are absolutely inconsistent with the obligation of the state to pay the interest and redeem the principal. As it is neither a gift, a deposit, the payment of a debt, or an equivalent for property purchased, and as it lacks none of the essential properties of a loan, I cannot do otherwise than regard it as a loan—a loan of money to be repaid at a future day—not from the taxable property of the people of the state, or from the resources and revenues of the state generally—but qualifiedly and specially from that portion of its resources known as the remainders of the canal revenues. There cannot be a loan of money without a lender and a borrower, and there cannot be a contract of lending without creating a debt and an obligation to repay, in some form and to some extent. The time of payment may be postponed to a distant day. The contract may provide that payment may be made in property, in current coin, or in a depreciated currency. It may be payable, as in the case of the canal certificates, from the proceeds of the income of certain specific property, but it remains a debt, notwithstanding. The particular form or medium of payment, or the specific source from whence the means of payment is to be derived, may lessen or circumscribe the obligation of the debtor, but it cannot efface the obligation, or transform it into something which is to be recognized by another name, until the source from whence it is to proceed has failed, and the means of its payment is extinguished. Sir. Wm. Blackstone defines a debt to be a contract " whereby a certain sum of money is mutually acquired and lost—any contract, in short, whereby a determinate sum of money becomes due to a person, and is not paid, but remains in action merely, is a contract of debt." (2 *Black. Com.* 464.) To constitute a debt there must be a contract, either express or implied, but it is not indispensable that the liability created by the contract should extend so

far as to subject the person of the debtor, or all his property, to be seized upon the final process of the courts issued to coerce its payment and satisfaction. The person of the debtor is no longer exposed to seizure in satisfaction of his contract debts, and the amount in value of his property not subject to the payment of his debts has been enlarged from time to time during the last 37 years. Contracts for the payment of money do not the less create debts because the laws for their collection have yielded to the humanizing influences of latter times. Debts, like personal torts, do not perish with the person of the debtor, but they survive, to be recognized by the law as debts, to be paid from the proceeds of the specific real or personal estate which was his at his death. There is no more any debtor, but the debt remains. Both the written and unwritten law denominate and deal with these rights to payment as debts against the estate. A debt payable only out of the proceeds of a trust estate, is none the less a debt because there is no personal obligation resting upon any one for its payment further than the obligation of executing the trust with fidelity, and no source from whence it can be paid but the trust property. If these positions be sound, then it must necessarily follow, that money advanced to a state at its own request, and applied to its own use, upon a written contract that it is to be repaid, with the interest, from the proceeds of the sales of its public domain, or from the proceeds of any other specific branch of its revenue, and from no other source whatever, must create a debt within the legal as well as the universal sense of the term. Does not the state obtain a credit upon the confidence in its ability to repay from the source indicated ? and does it not incur a positive obligation to see that the canals are properly and prudently managed, and made as productive as circumstances will admit, and that the fund proceeding therefrom is faithfully applied in liquidation of the interest and in the redemption of the principal sums borrowed ? If a state may obtain an advance of moneys, to be repaid, with the interest, from a part of its resources, and not create or incur a debt, I see no reason why it may not by the same means evade the creation of a debt when

all its resources are to be given over to those advancing the money for its repayment. Whether the obligation to repay is general or special—whether the contract is to pay from one or from all the resources at its command—it cannot be regarded otherwise than one that imposes a duty and creates a debt.

I am next to determine whether the provisions of the act of the 10th July, 1851, conflict with the disposition made of the remainders of the canal revenues by the 3d section of the 7th article of the constitution. The predominant objects of the first three sections of the 7th article are, the payment from the canal revenues of the canal debt, the general fund debt, and the completion of the Erie canal enlargement, and the Genesee Valley and Black river canals. Those who recognize and reverence the sovereign authority of the people, and their right to all the attributes of self-government, will not dispute their power to prescribe for themselves, in a written constitution of government, the means they would employ, the manner in which, and the time when, they would proceed to accomplish those objects. Until the 1st of June, 1855, the sum of $1,300,000, in each fiscal year, and after that time the sum of $1,700,000 in each fiscal year, is devoted, by the 1st section, to pay the interest and redeem the principal of the canal debt until it shall be wholly paid. After complying with the requisition of the first section, and until the canal debt is extinguished, the sum of $350,000, in each fiscal year, and after the canal debt is extinguished the sum of $1,500,000, in each fiscal year, is by the 2d section set apart from the canal revenues for the redemption of the principal and interest of the general fund debt, until the same shall be fully paid. After complying with the requisitions of the 1st and 2d sections, and the payment of the expense of superintendence and repairs, a sum not exceeding $200,000, out of the surplus revenues of the canals, shall in each year be paid to the treasurer to defray the necessary "expenses of the state;" and the remainder of the revenues of the said canal shall, in each fiscal year, be applied in such manner as the legislature shall direct to the completion of the Erie canal enlargement and the Genesee Valley and the Black river canals, until the said canals shall be com-

Rodman *v.* Munson.

pleted." In these four several dispositions of the canal revenues we recognize what are usually denominated the pledges of the constitution, and when the purposes they were designed to effect are completed the canal revenues will be liberated, all restraint over them will be removed, and they will be placed at the disposal of the legislature to lessen the burthens of government, and be applied to the uses of the whole people. The latter clause of the 3d section is the principal subject of the present inquiry, and if we separate it into parts and look at each in their order, we shall be better able to comprehend its true import. The end to be accomplished is the completion of the Erie canal enlargement and the Genesee Valley and Black river canals. The manner of its accomplishment is committed to the discretion of the legislature. The means by which it is to be accomplished are the remainders of the canal revenues; and the time of their application is in each fiscal year when such remainders accrue, or are ascertained. The passage reads thus : " And the remainders of the revenues of the said canals shall, in each fiscal year, be applied." In putting a construction upon this sentence, we are not at liberty to strike out or transpose any of the words. The work of transposition, in some rare instances, may be applied in the construction of wills, deeds, and other written instruments, carelessly and incoherently fashioned, and then only to give effect to an obvious intention, and when the parts to be transposed give to the instrument an absurd or impracticable meaning, or are opposed to some other parts, or to its general scope or meaning. Here, there is no uncertainty, no obscurity, and no incongruity to be removed by a reconstruction of the sentence. To transpose some of the words of the sentence from the place where they now stand to some other place, where it was intended they should not stand, is to substitute a new reading and a new sense, for a reading and a sense already plain and intelligible, and to cause the instrument to convey a meaning, and effect a purpose, which those who made it designed it should not convey and effect. In short, such a process is mutilation and positive destruction. The process of transposing words has never yet been applied to reform a written constitution—the organic law

of a state, carefully framed, elaborately discussed and widely circulated before it was adopted. This method of removing restraints and limitations put upon delegated power, is as novel as it is extraordinary. If the law of transposition is to obtain, written instruments of government are no longer of any value, and there is no longer any ground upon which the friends of constitutional government can stand. We are bound to assume, that the words in "each fiscal year shall be applied," are not in the section by accident, or mistake, but by design—a design preconceived and premeditated to effect a settled determinate purpose—that they have an office to perform, and that is to prescribe the time when the remainders shall be applied in the work of completion. They are not to be accumulated; they are not to be anticipated. The remainders of twenty years of revenue are not, by any contrivance, to be gathered together in a mass, and expended within a brief space, long after or long before they are realized; but the injunction of the constitution is, that they shall be applied and expended in each fiscal year. The term "each fiscal year" is employed in the two previous sections of the 7th article. Thirteen hundred thousand dollars is set apart, in each fiscal year, until June, 1855, $1,700,000 is set apart in each fiscal year after that time, to liquidate the canal debt, by the first section : and $350,000 is set apart in each fiscal year until the principal and interest of the canal debt is extinguished, and after that time $1,500,000 is set apart, in each fiscal year, to liquidate the interest and redeem the principal of the general fund debt, by the 2d section. These uses of the same expression, in sections 1, 2 and 3, of the same article, have all the same signification and import, and show as clearly as written language can convey the thoughts and purposes of the human mind, that the application of the entire revenues is to be yearly, and in each fiscal year, to the uses indicated. If the words "shall in each fiscal year be applied," as employed in the 3d section, impose no duty upon the legislature in regard to the time of the application of the remainders to the completion of the canals, neither do the words, " set apart in each fiscal year," in the first

section, or the words, " set apart out of the surplus revenues of the state canals in each fiscal year," as used in the 2d section, impose any duty upon the legislature in regard to the time of applying the revenues to the extinguishment of the canal debt and the general fund debt.   No one has ventured to maintain, that the legislature may, without disregard to its most solemn obligations, accumulate, or anticipate, the revenues set apart to pay these debts, or apply·them at any other time than in each fiscal year, as they accrue and are ascertained.   In the print-ed argument, to which I have referred, much significance is sought to be given to the words "applied in such manner as the legislature shall direct," as they are found in the closing sen-tence of the 3d section.   The word applied is supposed to vest in the legislature a large measure of discretion.   Reference is made to the case of *Leggett* v. *Perkins*, (2 *Comst.* 297,) in which the court of appeals held, that a trust to receive the rents and prof-its of land and pay them over to the beneficiary, is valid within the statute of uses and trusts authorizing the creation of trusts to receive rents and  profits and apply them  to  the use of any person.   The distinction had been taken, that a discretion was an essential element of a legal trust, and that in a mere trust to receive and pay over, there was no room for the  exercise of dis-cretion by the·trustee, while in a  trust to receive and  apply  to the use of  the cestui que trust there was.   A bare majority of the court held, that one species of  trust was equally valid with the other.   If this adjudication influences in any way the ques-tion of time in the execution of a trust, whether it be a  trust to receive and pay over, or a trust to receive and apply to the use of the beneficiary, I am  not able to  perceive it.   It does, how-ever, serve to show how earnest the law is  to give effect to the precise words employed in the creation of a trust.   If the third section was silent in  respect to the time when the  remainders were to be applied, "in such manner as the legislature shall di-rect," the argument would  not be without effect : but when we see that the passage quoted is immediately preceded by the con-trolling words, "shall in each fiscal year," so as to read " shall in each fiscal year be applied," it is not possible, upon any sound

rule of construction, to say that the legislature have any discretion as to the time of the application. It has a discretion as to the manner, in each fiscal year.

It may be useful in this connection to ascertain under what circumstances the law regards time as of the essence of an agreement, or as a condition to be observed in the execution of a trust. "Time is not generally deemed, in equity, to be of the essence of a contract, unless the parties have expressly so treated it, or it necessarily follows from the nature and circumstances of the contract." (2 *Story's Eq. Jur.* 776.) " When a court of equity holds that time is not of the essence of a contract, it proceeds upon the principle that having regard to the nature of the subject, time is immaterial to the value, and is urged only by way of pretense and evasion. But that principle can have no application when, from the nature of the subject, the value is exposed to daily variation. (*Doloret* v. *Rothschild*, 1 *Sim. & Stu.* 590.) I do not see, therefore, why, if the parties choose even arbitrarily—provided both intend so to do—to stipulate for a particular thing to be done at a particular time, such a stipulation is not to be carried literally into effect in a court of equity. This is the real contract. The parties had a right to make it. Why then should a court of equity interfere to make a new contract which the parties have not made." (*Opinion of Baron Alderson in Hepwell* v. *Knight*, 1 *Y. & C.* 415.) It is a general rule that a power cannot be exercised before the time in which it was the intention of the grantor of the power that it should be exercised. This was the principle assumed by Lord Coke ; (*Coke Litt.* 113, *a ;*) and in *Cox* v. *Day*, (13 *East*, 118,) it was adjudged that when a power of leasing was given to B., to be exercised after the death of A., it could not be exercised during the life of A. (4 *Kent's Com.* 334. *Vide also Blacklow* v. *Laws*, 2 *Ha.* 40 ; *Johnstone* v. *Baber*, 8 *Beav.* 233,) where the power of the court of chancery to decree a sale of real property in anticipation of the time appointed in the instrument creating the trust is expressly denied. Time becomes a controlling question in determining when the absolute power of alienation of real, or the absolute ownership of personal estate is

suspended for a period prohibited by law. The unsparing rigor. with which it applies its rules to the construction of the statutes against perpetuities will be seen from Mr. Justice Bronson's opinion in *Hawley* v. *James*, (16 *Wend.* 171.) "The question," he says, "is not whether the trust probably will, but whether it can transgress the statute rule. It must be so limited in point of duration that it cannot in any event exceed two lives : otherwise it is void in its creation. There is no way in which we can give effect to the statute but by adhering strictly to the measure of duration which it prescribes. The utmost limit for which alienation may be suspended must be measured by lives, and there can only be two lives. The limitation may be for a shorter period than two lives—it may be for one life. But life must, in some form, enter into the limitation. No absolute term, however moderate or however short, can be maintained ; and no uncertain term, the utmost limit of which is not bounded by lives, can be sustained. In short, the statute has said that alienation shall not be suspended beyond two lives by any limitation or condition whatever, and any disposition which may work a larger suspense must be utterly void." I must, therefore, regard it as the settled law of the courts, that time may be, and oftentimes is, of the essence of a contract : that in creating a trust estate the time or measure of its duration must be in strict conformity with the statutes ; and that powers and trusts to be executed at, or after a given time, cannot be legally executed before the time. Upon what ground of authority then, can the legislature assume to execute the trust confided to it by the people in regard to the completion of the canals, and the application of the canal remainders, in anticipation of the time expressly designated in the instrument which creates the power and confers the trust ?

The canals and the canal revenues were the common property of the people of the state. The three first sections of the 7th article pledge the principal portion of the revenues to the redemption of the public debt—a small portion to defray the necessary expenses of the government, and the remainder to the completion of the unfinished canals. In the payment of the public debt, and in defraying the necessary expenses of the gov-

Rodman *v.* Munson.

ernment, all the people of the state had a common interest, and in the appropriations for that purpose they shared a common benefit. But in the completion of the unfinished canals there were large portions of the people who had no manner of interest, and in the appropriations for that purpose they took no benefit. It was manifestly most advantageous to them that the canal revenues should be liberated, and restored to the uses of the whole people the moment the public debt was liquidated. The first three sections were doubtless an adjustment of these several interests, and they will not be executed in their true spirit and meaning, unless the remainders are applied yearly, and in each fiscal year, in the work of completion : because, if applied to pay interest upon moneys obtained to perfect the work of completion immediately, and before the stipulated period, the time for the liberation and restoration of the canal revenues to general uses, may be postponed perhaps indefinitely. The insuperable objection to the act of the 10th July, 1851, is, that it does not propose to proceed with the work of completing the canals gradually, but certainly, from year to year, and in each fiscal year, as the remainders shall accrue and be ascertained, but with nine millions to be obtained from the sale of the certificates, it proposes to prosecute the works to completion within three years from the passage of the law. It does not propose to apply the remainders to the work of completing the canals from year to year, and in each fiscal year, as they shall accrue and be ascertained. But it proposes from and after the close of the fiscal year 1854, to apply the whole of the remainders to the payment of the interest and the redemption of the principal of the canal revenue certificates. Such a disposition and application of the remainders of the canal revenues finds no authority to justify it. It is expressly forbidden, and wrongful, and illegal. It creates no obligation and imposes no duty which the officers of the government are bound to execute. The provisions of the statute, and the provisions of the constitution cannot stand together. They cannot both have effect. They are in conflict, and in such a conflict the latter instrument must prevail.

The People *v.* Newell.

Judgment is given for the defendant, with leave to the plaintiff to withdraw the demurrer and answer within twenty days, on payment of costs.(*a*)

[ORANGE SPECIAL TERM, April 5, 1852. *Brown*, Justice.]

(*a*) Affirmed on appeal to the general term.