[No. 21264. *En Banc.* June 14, 1928.]

THE STATE OF WASHINGTON, *on the Relation of John H. Dunbar, Appellant,* v. BOARD OF TRUSTEES OF CHENEY STATE NORMAL SCHOOL *et al., Respondents.*[1]

[1] STATES (22, 34)—PUBLIC DEBT AND SECURITIES—BONDS FOR SCHOOL DORMITORIES—PAYMENT—DIVERSION OF INCOME. Rem. 1927 Sup., §§ 4543-1 and 4543-2, authorizing the erection of dormitories by the trustees of the institutions of higher education and the issuance of bonds therefor, to be paid for out of the net income from rentals, without any liability on the part of the state, was intended to make the buildings the exclusive source from which the payment of the bonds shall be made; hence the trustees have no power to divert and pledge thereto the income from the rentals of other dormitories already erected and belonging to the school (FULLERTON, C. J., and HOLCOMB, J., dissent).

Appeal from a judgment of the superior court for Thurston county, Wilson, J., entered April 17, 1928, upon sustaining a demurrer to plaintiff's complaint dismissing an action to enjoin the expenditure of public funds. Reversed.

'Reported in 268 Pac. 862.

*The Attorney General* and *H. C. Brodie, Assistant,* for appellant.

*John E. Blair,* for respondents.

MITCHELL, J.—This action was brought to enjoin a bond issue proposed by the trustees of the Cheney Normal School in providing additional dormitory and dining room facilities at that school, under ch. 91, Laws of 1925, Ex. Ses., p. 120 (Rem. 1927 Sup., § 4543-1). The action was commenced in the superior court.

The facts as stated in the complaint are substantially as follows: That Monroe Hall and Senior Hall were constructed on the school campus in 1915 and 1920 respectively and that they are the property of the state and used wholly in connection with the school. The one is used as a dormitory and for dining room purposes and the other only as a dormitory. That Sutton Hall was built in 1923 and has been used and operated as a dormitory at all times since under a lease under which there has been expended out of the net income arising from all of the dormitories approximately $25,000, which amount has been received by the owner of the building as a pro rata payment for that hall, leaving a balance of $75,000 due on the purchase price. That the three halls have been operated and managed by the board of trustees together under a system of receipts and expenditures as a single fund under the supervision and authority of the state bureau of accountancy without any objection and as a fund belonging to the school and subject to disbursement by and upon requisitions of the board of trustees. That it would not be practical but wasteful to provide help and supplies to maintain an accounting system for each dormitory—a method which would appreciably increase the charges for dormitory and dining room facilities to the students of the school.

That, in order to provide for proper housing and boarding for the students and faculty of the school, the board of trustees by resolution ordered the erection of another building upon the campus to be known as the Commons Building at a cost of $175,000. That the trustees propose to pay the cost of this building and the remaining $75,000 due on Sutton Hall by proceeds from the sale of bonds in the sum of $250,000, which bonds shall be payable on the amortization plan over a period not exceeding twenty years and payable only out of the moneys derived from the net income arising from the rentals and other income from all four buildings.

That the resolution further provides that the state of Washington shall incur no liability by reason of the resolution or anything done pursuant thereto, under the authority granted by ch. 91, Laws of 1925, Ex. Ses., p. 120 (Rem. 1927 Sup., § 4543-1). That the board of trustees, on April 16, 1928, adopted a formal resolution reaffirming the contract for the purchase of Sutton Hall and the one for the construction of Commons Building and that, to pay for them, there should be executed and issued by the board of trustees of the school bonds in the aggregate sum of $250,000, dated March 1, 1928, bearing interest at four and one-half per cent per annum, payable semi-annually, the principal payable on the amortization plan as provided by the act, the ultimate maturity of the bonds to be March 1, 1948, and which bonds shall expressly provide that the payment of all principal and interest thereof shall be limited to a special fund derived from the joint net income from the rooming and boarding privileges arising from all four halls, and from such special fund only.

The complaint further states that, upon the construction of the proposed Commons Building, which

will include housing and dining room facilities, it will likewise be operated and managed with the other three buildings and the income received from all four buildings will be handled in one general fund and accounted for as planned. By allegations contained in the complaint, it is stated that the purchase and use of Sutton Hall and the construction and use of the Commons Building are reasonably necessary for the interest and economical conduct of the school, and in effect admitted that, without the expenditure and pledging of the net income and rentals arising from all of the existing dormitories and the proposed Commons Building, the funds for the payment of the proposed bond issue would be wholly insufficient and that Sutton Hall could not be purchased and paid for out of its own earnings and that the Commons Building could not be paid for out of its own earnings.

[1] The respondents demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was sustained, and the appellant refusing to plead further and electing to stand upon its complaint, has appealed from a judgment dismissing the action.

The act, omitting the title and enacting clause, is as follows:

"Section 1. The boards of regents of the University of Washington and of the State College of Washington, and the boards of trustees of the Washington state normal schools at Ellensburg, Cheney and Bellingham, Washington, are hereby authorized to enter into contracts with persons, firms or corporations for the erection of buildings for dormitory, housing and boarding purposes and for student activities; and said boards are further authorized to purchase or lease lands and other appurtenances necessary for the construction of such buildings, and to purchase or lease lands with buildings constructed thereon suitable for the purposes

aforesaid; and said boards are also authorized to lease to any persons, firms or corporations such portions of the campus of their respective institutions as may be necessary for the construction of buildings for the purposes aforesaid and the reasonable use thereof: Provided, that the state of Washington shall incur no liability by reason of exercise of the authority hereby granted to the said board of regents and trustees aforesaid other than as hereinafter specifically set forth, and provided further, that such lands, buildings or appurtenances shall be used solely for such dormitory, housing or boarding or student activities in such institutions. Said boards of regents and trustees are hereby authorized to contract to pay as rental or otherwise a sum sufficient to pay, on the amortization plan, the principal and interest thereon, of the purchase price of said lands and buildings or the erection costs of said buildings or appurtenances, such contracts to run not over twenty years. The rate of interest on the principal on any such purchase or erection cost shall not exceed seven per cent per annum payable semi-annually or annually as determined by said boards. (Rem. 1927 Sup., § 4543-1.)

"Sec. 2. Said boards of regents and trustees are hereby authorized to expend on the amortization plan any part of the rentals on any or all rooms, dormitories, dining rooms, housing or student activity buildings, lands or the appurtenances thereon, and to pledge on behalf of said institutions aforesaid, the net income from said rentals for the payment of all rental or erection or other contract charges agreed to be paid on account of such dormitory or dormitories, dining room, housing, and student activity buildings, lands or appurtenances." (Rem. 1927 Sup., § 4543-2.)

Thus, § 1 of the act authorizes the respective boards of regents of the University and of the State College and the respective boards of trustees of the several normal schools to enter into contracts for the erection of buildings for dormitory, housing and boarding purposes, to purchase or lease lands necessary in the construction of such buildings, and to purchase or lease

lands with buildings thereon suitable for such purposes; and to lease to any persons, firms or corporations such portions of the campus as may be necessary for the construction of buildings for the uses mentioned. It provides that the state shall incur no liability by reason of the exercise of the authority granted, except as later in the act set forth, and that such lands and buildings shall be used solely for dormitory, housing, boarding or student activities in such institution. The boards are authorized to contract to pay on the amortization plan, such contracts to run not over twenty years. The extent of the authority as to the number of buildings covers more than one, for it speaks of buildings. Section 2 of the act provides the manner and limitations for creating the fund to meet the contract obligations. It provides that the boards are authorized to expend on the amortization plan any part of the rentals on any or all rooms, dormitories, dining rooms, housing and student activity buildings, and to pledge the net income from such rentals for the payment of all contract charges agreed to be paid on account of such buildings, lands or appurtenances.

At the threshold it is necessary to construe this act, as to whether the legislature intended to authorize the different boards to include in the special fund from which payments should be made anything more than the net income from the building or buildings acquired under the contract or contracts. Had such been the purpose and intention of the legislature, it could easily have said that payments should be made out of the net income derived from the new building or buildings and from other dormitory and dining room buildings now on the campus or used in connection with the school.

In authorizing cities and towns to create special funds to meet the costs of acquiring, adding to and extending public utilities, the legislature of this state has

been careful and specific to provide that the fund shall be established with reference to public utility property already in use together with that acquired by additions or extensions and that payments shall be made out of the fund according to the rights and burdens of all the property. Rem. Comp. Stat., § 9491; Session Laws of 1909, p. 584, § 4. Local improvements in cities and towns are paid for by assessments upon property specified as located between the termini of the improvement and to a distance back from the marginal lines of the way improved, as defined in the statute. Rem. Comp. Stat., § 9365. The same is true in the improvement of county highways under the Donohue Road Law. Rem. Comp. Stat., § 6599, Session Laws of 1917, p. 238, § 1. There are other kinds of improvements such as ditches, drains, etc., payable by assessments on lands benefited, but the statute provides the manner for the ascertainment of such lands by examinations, reports and public hearings.

From the reports and decisions, the legislatures of other states have been just as specific in language used for the purpose of creating or authorizing the creation of special funds to meet obligations. In *City of Joliet v. Alexander,* 194 Ill. 457, certificates of indebtedness for the extension of the water works system of the city were involved. The act of the legislature, Illinois Session Laws of 1899, p. 104, provided that payment for the building, purchase or enlargement of such system should be by certificates limited in payment solely to the water fund which should consist of the entire proceeds arising from the operation of the water system, and in order to secure the payment of the certificates the city was authorized to mortgage "the water works system so acquired or enlarged."

In *Brockenbrough v. Board of Water Commissioners,* 134 N. C. 1, 46 S. E. 28, there was involved an act of

the General Assembly of 1903, ch. 196 Private Laws, by which the city of Charlotte was authorized to issue certain bonds to pay for an extension of the city's water system. The act provided:

"All bonds so issued shall be equally and ratably secured by first mortgage or deed of trust upon all the real estate, rights, franchises and other property of every description owned and held by said board, and which was purchased by the city of Charlotte from Charlotte City Water Works Company, as well as all other property, rights, and franchises which may hereafter be purchased or acquired by such board for the purpose of extending, maintaining and operating said system of water works by said city."

To the same effect is the language of an act of the legislature of New York for the completion of the Erie Canal enlargement and Genesee Valley and Black River Canals as it appears in *Rodman v. Munson,* 13 Barb. 63; and in the case of *Newell v. People,* 7 N. Y. 9. The statutes of other states might be cited to the same effect. It is true that in the cases just cited the construction of the respective statutes, in the sense we are now construing our statute, was not involved. But they are referred to as plain, common models of expressions of legislative bodies in granting powers to corporations or public boards to create special funds as broad in their scope as the board is insisting upon in this case.

It is interesting to note that, after the passage of our law in 1925, the legislature of North Dakota in 1927 passed a law upon the same subject. It is set out in the recent case of *Wilder v. Murphy,* 218 N. W. (N. D.) 156. It consists of two paragraphs and is for all practical purposes identical with our act, except in one particular, viz: in § 2 which provides for or authorizes the special fund for making payments it says: "out of the

net income derived therefrom *and from other dormitory buildings on the same campus.*" That was what the legislature of North Dakota meant and found it necessary to say.

Again, after the enactment of our statute, the legislature of Oregon, in 1927, enacted a law upon the same subject, consisting of two sections. That act is in every particular identical with ours except the names of the schools involved. After the effective date of the Oregon law, the board of regents of the University of that state adopted a resolution providing for the building of a dormitory the cost to be met by the issuance and sale of bonds payable on the amortization plan over a period of time not exceeding twenty years. Payment was limited to "the special fund to be derived from the net income from said building, and from that fund only." The resolution further provided that the board of regents would so expend the net rentals from that building in payment of the bonds and interest and would pledge the same accordingly. Suit was brought to enjoin the issuance and sale of the bonds. The trial court upheld the validity of the proceedings for the issuance of the bonds and dismissed the action. In affirming the judgment, the supreme court in *McClain v. Regents of the University,* 265 Pac. (Ore.) 412, in a carefully worded opinion, cautiously stating that the court was deciding only the precise question before it, and was not undertaking to say to what extent the "special fund doctrine" should be applied, gave an analysis of the act in most important particulars, which analysis merits approval and is decidedly helpful in the consideration of our statute as applied to the present case. In that case the court said:

"We think the act is reasonably susceptible of the construction which the regents have given it as dis-

closed by their resolution. It does not purport to authorize the board of regents to contract any indebtedness other than to pledge, on behalf of the University, the net income from the rentals of the building. The regents are not taking from any existing fund the revenue of the University, but propose that the dormitory to be erected will earn enough to pay the principal and interest of the bonds. Indeed, the building is the exclusive source from which the payment of the bonds can be made."

If that is what the statute means, and we think it is, the proposed issue and sale of bonds involved in this case cannot be sustained. Here the trustees of the normal school do not propose to pledge simply the net income from the rentals of the buildings to be acquired, but in addition thereto the net income from the rentals of other buildings already belonging to the state. In the Oregon case, the court said that the regents were not taking from any existing fund the revenue of the University because they proposed that the dormitory to be erected should earn enough to pay the principal and interest of the bonds. Here the trustees propose to take from a fund which already accumulates in favor of the school, the diversion of which may necessitate additional taxation and appropriation. In our opinion the plan of the board of trustees by taking in the net rentals of buildings on the campus already belonging to the school, goes beyond the limits of the special fund the legislature intended to authorize.

We may say that the contract under which the board of trustees has been operating Sutton Hall is not in this case nor affected by this decision.

Reversed and remanded with directions to the superior court to overrule the demurrer to the complaint.

MAIN, ASKREN, FRENCH, TOLMAN, PARKER, and BEALS, JJ., concur.

HOLCOMB, J. (dissenting)—This decision puts too strict, narrow and limiting a construction upon §§ 1 and 2, ch. 91, Laws of 1925, Ex. Ses., pp. 120, 121 (Rem. 1927 Sup., §§ 4543-1, 4543-2).

FULLERTON, C. J., dissents.