HESSE, Appellant, v. CITY OF WATERTOWN, et al, Respondents.

(232 N. W. 53.)

(File No. 7017.  Opinion filed September 22, 1930.)

*Hanten, Hanten & Henrikson,* of Watertown, for Appellant.

*Howard B. Case,* City Attorney, and *George W. Case,* both of Watertown (*Junell, Oakley, Driscoll & Fletcher* and *Hugh H. Barber,* all of Minneapolis, Minn., of counsel), for Respondents.

*Dunham & Clark,* of Clark, amici curiæ.

MISER, C. This action is brought under the Uniform Declaratory Judgment Act, being chapter 214, Laws 1925. Omitting all findings not essential to the decision of the questions here raised, the facts as found by the trial court are as follows: Plaintiff and appellant has, for many years, been a resident freeholder of the defendant and respondent city of Watertown and a patron of its municipal light plant. The other defendants and respondents are the mayor, auditor, treasurer, and members of the council of the city. For more than five years, Watertown has owned and operated its own electric light plant, having been thereto authorized by a vote of the people. This electric light plant had a maximum rated capacity of 850 kilowatts, all of which was being required by the users of electric current in the city. The municipal light plant furnished electricity to the city of Watertown for the pumping of water in the municipally owned and operated water system and also for the pumping of the sewage in the Watertown sewer system. In addition thereto, the municipal plant furnishes electricity to residences, business houses, and industries, including the Swift Packing Company. At the time of the trial of this action in September, 1929, there was being operated in competition with the municipal plant, under a franchise granted in 1909, a privately owned electric light and power plant, whose franchise would expire on October 20, 1929. On March 18, 1929, at the time of the passage of the ordinance hereafter mentioned, the municipal plant was distributing approximately 75 per cent of the electricity required in the city. In furnishing this electricity, the maximum rated capacity of the municipal plant had been exceeded. This and the increasing demand made it necessary to increase the capacity of the plant. On March 18, 1929, the mayor and city council passed ordinance known as C-31, without a vote of the people having been had prior thereto upon the subject of the issuance of the municipal

electric light plant revenue bonds proposed therein to be issued, and without the filing with the city council of a petition of its citizens and taxpayers with relation to the passage and approval of said ordinance or of the issuance of the revenue bonds therein proposed to be issued.

Ordinance C-31 provides for the issuance of $150,000 of revenue bonds to provide for extensions, improvements, and additions to the municipal electric plant of the city of Watertown. These bonds mature in each of the years and amounts as follows: 1932 and 1933, $5,000; 1934, 1935, 1936, and 1937, $10,000; 1938, 1939, 1940, 1941, and 1942, $20,000. Each bond specifically recites that it "is payable solely from the municipal electric plant development fund of said city heretofore created, and does not constitute a general indebtedness of said city within the meaning of any constitutional or statutory provisions or limitations, and the taxing powers of said city are not pledged and shall never be used to pay either principal or interest of this bond or any part thereof."

Section 3 of the ordinance, omitting those parts not absolutely essential to this decision, is as follows:

"Section 3. From and after delivery of any bonds issued under the provisions of this ordinance, the income and revenues of said Municipal electric plant of the city of Watertown shall be set aside into a separate and special fund to be used in maintaining said plant and in payment of the aforesaid bond, which revenues shall be apportioned as follows:

"Forty-five per cent of the incomes and revenues of said plant shall be set aside and used for the proper operation and maintenance of said plant. * * *

"Ten per cent of the incomes and revenues of said plant shall be set aside to the depreciation fund and shall be expended in making good any depreciation in said municipal electric plant and in making good any extensions, additions or constructions to the property of said plant * * *

"Forty-five per cent of the income and revenues of said plant, from month to month as the same shall accrue and be received, shall be paid into the account of the treasury of the city of Watertown and identified as *Municipal Electric Plant Development Fund* for the purpose of paying the principal and interest of the bonds herein authorized to be issued.

"Provided, however, that when and if there shall ever be moneys in said Municipal Electric Plant Development Fund in excess of the amount of moneys required to pay the principal and interest of the bonds issued pursuant to this ordinance which principal and interest is to become due during the then current fiscal year and the next ensuing fiscal year, such excess may be transferred from said fund upon order of the city council and used for the payment of any obligations of the city which the city council may order."

Section 4 provides that, while any of the bonds authorized thereunder shall remain unpaid, the rates for all services rendered by the plant shall be reasonable and just, "taking into account and consideration the value of said Municipal Electric Plant, the cost of maintaining and operating the same, and the proper and necessary allowance for depreciation thereof, and a sufficient and adequate return upon the capital invested." It also provides that the city shall pay for public service furnished it.

In section 6 it is provided that the city of Watertown "hereby irrevocably pledges said Municipal Electric Plant Development Fund to the payment of the principal and interest of said bonds, subject only to the limitation as to excess funds therein as specified in Section 3 hereof, and any holder of said bonds * * * may by suit, action, mandamus or other proceedings, enforce and compel performance of all duties required by this ordinance, * * * [and] * * * have appointed a receiver to administer said municipal electric plant and system on behalf of said city with power to charge and collect rates sufficient to provide for the payment of any and all bonds * * * then outstanding. * * *"

At the time of the passage of this ordinance, the total bonded indebtedness of the city of Watertown was $1,114,000, less accumulated sinking funds of $297,099. In addition bonds in the sum of $200,000 for an auditorium had been voted; but no attempt had been made to issue them. So that the net outstanding bonded debt of the city of Watertown was $816,901, without including the proposed revenue bond issue of $150.000.

For a period of years prior to the passage of this ordinance, the profits of the municipal plant had been increasing. The city council determined that the revenues from its operation would be sufficient to pay its total operating expense, to keep its plant in

first-class condition, to pay interest on the "outstanding bonded indebtedness against said electric light plant, besides paying into the sinking fund the required amount each year to provide for meeting the outstanding bonds against said electric light plant as they matured, together with the principal sum of the bonds * * * and without levy of assessments, or the taxation of property be fully competent to meet and pay all the operating expenses, indebtedness and requirements of said plant annually."

After the passage of this ordinance, the city purchased a site for the proposed additional building necessary to house the additional machinery and entered into contracts for the construction of the building and for the purchase of the necessary machinery for an additional unit. Thereafter the Watertown Public Service Company, the private company heretofore mentioned, announced its intention to withdraw from the distribution of electric current in Watertown.

The court found that the proposed addition to the municipal plant for which the revenue bonds were to be issued and sold would increase the capacity and efficiency of the plant from 850 kilowatts to 2,350 kilowatts; that it was not the purpose of the city council to pay for this addition from funds other than those received as provided in Ordinance C-31, nor to pledge the plant or any property of the city as security for the payment of said bonds.

The court concluded that the city council was authorized to adopt Ordinance C-31, and that the same is now a subsisting ordinance; that the proposed bond issue would not create a lien upon the municipal light plant nor create a debt or indebtedness against the city, nor subject the taxable property of the city to a levy of tax for the purpose of paying the same or any part thereof. The court further concluded that the city council could resort to no method of payment of said revenue bonds except from the earnings of the plant as provided in the ordinance, but the bonds would be enforceable against the revenues to be derived from the operation of said plant, that the city council had authority to issue and sell said revenue bonds, and that, when so issued, said bonds would constitute a lien on 45 per cent of the gross revenues and the income of the plant as improved and enlarged, for the purpose of payment of said revenue bonds. Finally, the court concluded that the city of Watertown and the defendants, its mayor, auditor, treas-

urer, and aldermen, were entitled to a declaratory judgment adjudging the legality of the proceedings of the council in the issuance and sale of the revenue bonds and the building and construction of the addition to the plant, and that the mayor and city council have authority to issue revenue bonds in the sum of $150,-000 and sell the same under Ordinance C-31 for the purposes set forth in the findings. Judgment was entered accordingly.

Thereafter, on November 25, 1929, motion for new trial based on the settled record in the case was denied by the trial court. This appeal is from the judgment and order denying motion for new trial.

The trial court did not find, although the evidence clearly showed, that the municipal light plant, as of the date of the passage of the ordinance, cost the city in excess of $700,000 and was financed by five bond issues authorized by the electors in the total sum of $697,000, all of which bonds are outstanding and unpaid. Toward the payment of these bonds the sum of $189,675.38 has been accumulated in the sinking fund. This bonded indebtedness of $697,000 originating in the construction of the electric light plant does not include the $80,000 street lighting system bonds all of which are outstanding and unpaid. Nor is it found, although the evidence shows, that the income from the addition proposed to be constructed from the proceeds of the $150,000 revenue bonds will be necessarily and indistinguishably merged with the income from the $700,000 plant already built.

Appellant contends that the bonds proposed to be issued without a vote of the people so authorizing would be in violation of section 4 of article 13 of our Constitution, wherein it is declared that "no such debt shall ever be incurred for any of the purposes in this section provided" (including indebtedness incurred for the purpose of constructing electric lighting plants) "unless authorized by a vote in favor thereof by a majority of the electors of such * * * municipal corporation." Whether the indebtedness proposed to be created constitutes a debt within the meaning of that section of the Constitution is a question on which authorities differ. No useful purpose would be served in deciding that question if the ordinance and bonds are invalid as violating the statutes of the state, as appellant also contends.

The first of these statutory objections also calls for a reference

to the Constitution. Section 1 of article 10 of the Constitution contains the following: "The legislature shall restrict the power of such [municipal] corporations to * * * borrow money * * * so as to prevent the abuse of such power."

Although respondents contend that section 6413, Rev. Code 1919, as amended by chapter 228 of the Laws of 1923, does not apply to bonds such as are sought to be issued herein, unless that section does apply, no statutory provision appears to have been made for the issuance of such bonds. Of course, respondents do not and cannot base their statutory right to issue the proposed bonds on the authority of section 6413, for the double reason that that section requires the approval of three-fifths of the electors voting (chapter 228, Laws of 1923), and also that it limits the rate of interest to 5 per cent, per annum (chapter 171, Laws of 1927) ; whereas the proposed bonds are to bear interest at the rate of 6 per cent per annum and are proposed to be issued without the vote of the electors. Either of these differences would be fatal to the validity of the proposed bonds. Respondent's position is that the city of Watertown, having been expressly given the power to own, operate, and maintain the electric plant, possesses the implied power to do such things in its proprietary capacity as are necessary and reasonably pertinent to the operation and maintenance of such plant. Assuming, though not deciding, that the power expressly given by statute to own, operate, and maintain the electric plant carries with it the implied power to borrow money and issue bonds in payment of the purchase price thereof or additions and extensions thereto, can it be that the Legislature, which has expressly and carefully provided for the form, maturity, rate of interest, and denomination of all other municipal bonds, intended that revenue bonds be issued without these restrictions? Unless section 6413 applies to revenue bonds, the Legislature has to that extent failed to observe the constitutional mandate of section 1, art. 10, of the State Constitution hereinbefore quoted.

Respondents contend that section 6413 and subsequent correlated sections deal only with bonds payable from tax levies. No such restriction is expressly stated therein. So far as pertinent to the question before us, this section is as follows:

"Section 6413. *Power to Borrow Money and Issue Bonds.* Every municipal corporation shall have power to borrow money

on the credit of the corporation for any authorized corporate purpose, within the constitutional limitations of municipal indebtedness, and to issue its negotiable bonds therefor in such amounts and forms and upon such conditions as it may prescribe; provided, that no bonds shall be issued under the provision of this section, either for general or special purposes by any city, unless, at an election after ten days notice in a newspaper published in the municipality, stating the purpose for which the bonds are to be issued, and the amount and rate of interest thereof, the legal voters of such city, by a three-fifths of all the legal voters present and voting at such election shall determine in favor of issuing the same. * * * "

The source of this section, prior to its amendment, was subdivision 5, § 1229, Rev. Pol. Code. The only change made in section 6413 by chapter 228, Laws 1923, is the substitution of the phrase, "by a three-fifths of all the legal voters present and voting at such election," for the words, "by a majority of those voting at such election." Section 6413 applies to the bonds proposed to be issued, unless the city of Watertown, in the issuance of these revenue bonds, is not borrowing "money on the credit of the corporation." If, by the issuance of these proposed bonds, it is not seeking "to borrow money on the credit of the corporation," it must be because each bond expressly recites that it "is payable solely from the municipal electric plant development fund of said city heretofore created, and does not constitute a general indebtedness of said city within the meaning of any constitutional or statutory provisions or limitations, and the taxing powers of the city are not pledged and shall never be used to pay either principal or interest of this bond or any part thereof."

If the entire obligation of the city on the proposed bonds were to turn over to the bondholders the net income from an electric plant to be purchased with the proceeds of the bonds proposed to be issued, without any other promise to pay, it may well be doubted whether the provisions of section 6413 would have any applicability thereto. McQuillin Mun. Corp. (2d Ed.) vol. 6, § 2389; Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861; Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156, 161. In Lang v. City of Cavalier, 228 N. W. 819, 825, the North Dakota court cites many authorities to support its statement that "the great weight of authority is to the effect that a municipality does not create an indebtedness within

the purview of prohibitions against incurring indebtedness by purchasing property to be paid for wholly out of the income therefrom with no general liability."

But the entire obligation of the city on the proposed bonds is not to turn over to the bondholders the net income from property to be purchased with the proceeds of the bonds proposed to be issued. Let us examine these additional obligations:

(1) These bonds, which are signed by the mayor, attested by the auditor, with the seal of the city affixed, contain a recital that "the city of Watertown * * * for value received hereby promises to pay to bearer the sum of $1,000 on the 1st day of January 19— together with interest thereon * * * at the rate of 6% per annum." They also contain the recitals as to being payable solely from the municipal electric plant development fund, hereinbefore quoted, also a recital conferring on the holder all the rights, powers, privileges and remedies given by the ordinance, and also the following: "It is hereby certified, recited and declared that * * * a *sufficient* proportion of the income and revenues of said municipal electric plant and system has been pledged to and will be set aside into said municipal electric plant development fund for the payment of the principal and interest of this bond." Thereto are annexed coupons in form as follows:

"On the 1st day of January (July) 19— the city of Watertown, South Dakota, will pay to bearer ——— dollars in lawful money of the United States of America out of its municipal electric plant development fund at the First National Bank, Watertown, South Dakota, being six months interest then due on its municipal electric plant revenue bond No. ———.

"———————,
Mayor.

"———————,
"City Auditor."

(2) The city already has an electric light plant costing approximately $750,000. It proposes to spend the $150,000 raised by the issuance of the proposed revenue bonds for additions and extensions. The city obligates itself to place 45 per cent of the income, not merely from the $150,000 extension, but from the entire $900,000 plant in the municipal electric plant development fund from which the $150,000 revenue bonds are first to be paid.

(3) The electors have already voted, and the city has already issued from 1920 to 1924, five bond issues aggregating $697,000 to build the plant. This does not include an $80,000 bond issue in 1924 for a street-lighting system. Section 6998, R. C. 1919, provides that "whenever any city * * * shall issue *any* bonds * * * the governing body thereof shall * * * provide for the levying of an annual tax sufficient to pay" them when due and for placing said moneys in a sinking fund. On July 1, 1929, the Watertown electric light plant sinking fund amounted to $189,675.38. Whatever the source of the balance of it, $30,000 of it was the net profit of the operation of the plant in 1928. In the appropriation ordinance for the year 1929, the $76,582.50 electric light plant sinking fund requirement for that year was to be met entirely by the income from the plant. Prior to the $150,000 revenue bond issue, the sinking fund for the payment of the $697,000 bonds theretofore voted was built up, substantially if not entirely, from the income of the $750,000 plant. Under the provisions of Ordinance C-31, the city promises the holders of the revenue bonds that it will take nothing from that fund for the payment of the bonds heretofore outstanding except "when and if" there shall be moneys in said fund "in excess of the amount of moneys required to pay the principal and interest of the (revenue) bonds issued pursuant to this ordinance which principal and interest is to become due during *the then current* fiscal year and the *next ensuing* fiscal year."

To illustrate: $20,000 of the revenue bonds mature in 1940 and $20,000 mature in 1941. In 1940 the interest on the revenue bonds outstanding will be $3,600, and in 1941 the interest will be $2,400. Of the $697,000 of bonds voted to built the plant, $175,000 mature in 1940, $200,000 in 1941, and $225,000 mature in 1942. In 1940 none of the income from the plant built with the proceeds of these bonds may go into a sinking fund for their retirement unless there be moneys in the municipal electric plant development fund in excess of $46,000. So that not only is 45 per cent of the income of the $150,000 addition "pledged" to pay the revenue bonds issued to build it, but also 45 per cent of the income of the original $750,000 plant is "pledged" to pay the revenue bonds and "pledged" in such a way as to give the revenue bonds a favored share of the plant income. In other words, heretofore the income from the plant has been used to build up a sinking fund for the bonds

voted to build it; hereafter that income must first be used, not only to pay the principal and interest due on the favored revenue bonds, but to maintain a balance sufficient to meet the payments due the next year on the revenue bonds. If the income from the plant is insufficient, resort must be had to a tax levy to meet sinking fund requirements of the voted bonds.

(4) The city obligates itself to charge its customers rates high enough to allow the 45—10—45 division of its gross revenues.

(5) The city itself uses electric service. In 1928 the amount charged the city for street lighting was $15,804.69, for waterworks pumping $13,762. It may be presumed that the latter item was passed on to the water users; how much to the city as a water user does not appear. The street-lighting expense is paid by a tax levy. The 1929 appropriation ordinance makes a levy of $21,000 for street lighting. The city agrees to charge and collect such rates and shares for the service rendered by said plant within the limits prescribed by law so that 45 per cent of the gross revenues of said municipal electric plant will be sufficient to provide for the payment of the bonds herein authorized to be issued. It also agrees that "the reasonable cost and value of any service rendered to the city of Watertown, by said municipal electric plant by furnishing power, light and heat public service, shall be charged against said city and shall be paid for * * * out of the current funds *or proceeds of taxes* which such city is authorized to levy to meet its necessary current expenses."

(6) The city also "irrevocably covenants, binds and obligates itself not to sell, lease, or in any manner dispose of said Municipal Electric plant, including any extensions * * * that may be made thereto, until all the bonds herein authorized to be issued shall have been paid in full both principal and interest, unless and until provision shall have been made for the payment of said bonds and the interest thereon in full."

Yet subdivision 19, § 6169, as amended by chapter 242, Laws 1925, reserves to the electors of the city the right to determine whether and when to sell, convey, and dispose of any plant or equipment for furnishing heat, light, or power, and to contract for the leasing or operation of any such plant, equipment, or utility by others, as well as the terms and conditions of such contract. This heretofore unlimited right of the electors to determine

whether the city should sell or lease or operate the $750,000 plant, the city council, by Ordinance C-31, irrevocably binds and obligates the city not to exercise unless and until provision shall have been made for the payment of the $150,000 proposed revenue bonds; and the city agrees to maintain in good condition and operate the $900,000 plant.

Finally, in the list of obligations to which the city binds itself under Ordinance C-31, the city agrees that, if there be default in their payment, the holders of these $150,000 of revenue bonds may have a receiver appointed "to administer said municipal electric plant and system on behalf of said city with power to charge and collect rates sufficient to provide for the payment of any and all bonds and coupons then outstanding issued pursuant to this ordinance and for * * * the payment of the operating expenses and to apply the income and revenue in conformity with this ordinance."

So that the obligation of the city is not merely to pay over the net income from the $150,000 extension without other responsibility. To that duty the ordinance has added the following obligations: (1) A written *promise to pay* a sum certain in money, out of a fund the sufficiency of which the city assures; (2) a "pledge" of the income of the original $750,000 plant; (3) a "pledge" that it will not use the net income of this $750,000 plant as it has heretofore been used, that is, to first pay the bonds voted to construct it; (4) an obligation to charge consumers rates high enough to insure the prompt payment of the favored revenue bonds; (5) an obligation to itself pay these rates for city service from moneys raised by taxation; (6) a covenant not to sell or lease the $750,000 plant until the bonds issued to pay for the $150,000 addition are paid or provision made for their payment; (7) an agreement that a receiver may be appointed with a delegation of power to such receiver to charge and collect rates sufficient to provide for the payment of these favored bonds. Does the city borrow money on the credit of the corporation when it issues these revenue bonds, which, despite their recitals that they are payable solely from the municipal electric plant development fund and do not constitute a general indebtedness of said city, contain the seven foregoing additional obligations on the part of the city? Section 10, Rev. Code 1919, is as follows: "Except as defined and used in part 2, division 5, title 1, every one who owes to another the

performance of an obligation is called a debtor, and the one to whom he owes it, is called a creditor." Part 2, division 5, title 1 (sections 2036-2065), excepted from the foregoing definition, relates to assignments for benefit of creditors and fraudulent instruments and transfers.

· In City of Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861, 862, the court says:

"But it is not essential that there should be a right of action on the certificates against the city in order to constitute a debt, where its money or property can be taken in payment. Where one party occupies the position of creditor, and another of debtor, there is, in the common understanding, a debt, * * * One who pawns or pledges his property, and who will lose the property if he does not pay, is indebted, although the creditor has nothing but the security of the property; and so, also, is a mortgagor who is liable to lose his property if he does not pay the money secured by the mortgage. * * * The city owns an existing system of waterworks, with its lands, buildings, machinery, and appurtenances; and the ordinance provides for mortgaging that system to secure the certificates under the act providing for a foreclosure and sale, by which the city would be deprived of its property for a term of years, not exceeding 50.

*In addition to mortgaging the existing system, the ordinance proposes to take the income now derived from it, amounting to about $10,000 a year, and devote it to the payment of the certificates. This is existing property and income of the city derived annually from the present system of waterworks, independent of the extensions, and in no manner resulting from or depending upon it. The city is to lose property in the form of established income for the purpose of paying the certificates.*

"What is said relative to mortgaging property owned by the city, or pledging its existing income, is not intended to apply to a mortgage purely in the nature of a purchase-money mortgage, payable wholly out of the income of property purchased, or by resort to such property. This is not a case where there is no obligation of the city except the performance of a duty in the creation and management of a fund, and where the waterworks, upon paying for themselves, will become the property of the city. The reasoning in Winston v. City of Spokane, 12 Wash. 524, 41

P. 888, can not be applied to a case like this, and could only apply to property or a fund which the city never had, where the property is to be paid for by its own earnings without imposing any further liability on the city.

"It does not make any difference that the certificates are payable out of the special fund, if the city is the owner of the fund. All its obligations are payable out of some particular fund."

This case of Joliet v. Alexander, supra, has been cited many times. Even the courts which by reason of different constitutional or statutory provisions have not followed it have not successfully impeached its reasoning. Thus, in City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004, 1007, much relied upon by respondents, the Kentucky court, after analyizing the decision in Joliet v. Alexander, supra, Lesser v. Warren Borough, 237 Pa. 501, 85 A. 839, 43 L. R. A. (N. S.) 839, and Browne v. Boston, 179 Mass. 321, 60 N. E. 934, said: "In each of the cases cited the mortgagee was given the right to foreclose its mortgage against property belonging to the city, and because of *that* fact it was held that the city might be compelled to pay the debt by surrendering property which belonged to it, and for that reason it was the debt of the city, as much so as if there might have been a remedy by compelling the city to pay the debt with money collected by taxation. *Indeed there could be no great difference. In one case the city would be compelled to pay with its property and in the other it would be compelled to pay with the money obtained through taxation. If the property which would have to be used to pay the debt had previously been obtained by taxation, it would be a payment of the debt by the municipality.*"

But it may be argued that Watertown bonds do not constitute a mortgage. One might well inquire what is the nature of their lien. Despite the repeated use of the word "pledge," they do not constitute a pledge. Section 1605, Rev. Code 1919. A mortgage is a contract by which specific property is hypothecated for the performance of an act without the necessity of a change of possession. Section 1547, Rev. Code 1919. The main practical difference between the Watertown "pledge" and the Joliet mortgage is that in the Joliet mortgage the period in which the mortgagee or purchaser at foreclosure sale might operate the plant to collect his debt was fifty years, whereas in the Watertown case the bond-

holders under their receiver may operate the plant "with power to charge and collect rates sufficient to provide for the payment of *any and all bonds* and coupons *then outstanding."*

But whether the lien in the Watertown case is a mortgage or a pledge or whatever its technical definition, its ultimate effect is substantially the same as in the Joliet Case. There is certainly an hypothecation of existing income in the Watertown case as there was in the Joliet Case. There $240,000 of bonds issued to enlarge the plant were secured by the hypothecation on an income of $10,000. Here $150,000 of bonds are to be secured by the hypothecation of existing income from a $750,000 plant, which net income in 1924 was $11,980.84, in 1928 $58,127.44. This net income has been heretofore used by the city of Watertown toward the payment of the principal and interest on the $697,000 of electric light plant bonds issued to build the system. The 1929 appropriation ordinance contemplated the continuance of such use. If the principal and interest of the $150,000 of revenue bonds has first to be taken out of that net income and the residue is insufficient to pay the principal and interest on the $697,000 electric light plant bonds and the $80,000 distribution system bonds, the deficiency must be raised by taxation. If it be answered that the possibility of deficiency is very remote, it may be replied that average net income after paying interest on outstanding bonds for the five-year period from 1924 to 1928 was $27,522.18. The average net requirements for the years 1929 to 1944, inclusive, to pay the *principal* of the $697,000, plant bonds, $80,000 distribution system bonds, $150,000 revenue bonds, less $189,675.38 now in the sinking fund, will be $46,082.78, an excess of $18,560.60 over the average net income for the years 1924-1928. If it be answered that the remarkable increase in net income in 1928 and the removal of all competition after 1929 will make it easily possible to meet the bond requirements on or before maturity, it must be replied that the question now decided by this court is that of the right of the *electors* of Watertown to determine for themselves whether their city shall assume this risk and the obligations heretofore enumerated.

In State v. McMillan, 12 N. D. 280, 96 N. W. 310, 321, the North Dakota court quoted with approval the language of Johnson, J., in Newell v. People, 7 N. Y. 9, 2 N. Y. C. A. 143, thus: "It may be objected that there is a distinction between a pledge of the

revenues of property owned by the state and of the revenues to be derived from taxation; but the distinction does not affect the question. *Whatever consumes the revenues of the property of the state tends to render a resort to taxation necessary just to the extent to which the revenues from property have been consumed. It is, therefore, a matter of entire indifference whether one or another part of the resources of the state is drawn upon; for the substantial effect upon the financial condition of the state is the same in either case."*

In the same case, the North Dakota court quoted with approval Ruggles, C. J., in Newell v. People, as follows: "It makes no difference whether the debt is contracted on the general credit of the state or on the credit of a fund belonging to the state. When the interest on a loan is raised by a tax it comes from the pockets of the people individually, when it is paid out of a fund belonging to the people, it is paid out of their common purse. In respect to the profit and loss of the transaction, the objection is as great to the one mode of borrowing as to the other."

After reviewing the opinions of Ruggles, C. J., and Johnson, J., in Newell v. People, supra, and reviewing Joliet v. Alexander, supra, at length, the North Dakota court concluded: "The case of Mayor of Baltimore v. Gill, 31 Md. 375, 390, is to the same effect, and we know of no cases in which the soundness of the reasoning of these cases has been questioned."

In Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156, 161, the Supreme Court of our sister state quoted extensively from the McMillen Case, and said: "Defendants urge that * * * the income from the dormitories of the several educational institutions never reaches the treasury of the state, but goes into special funds known as institutional funds, where it remains until it is disbursed. They contend that, since this is so and since any obligations resulting from contracts made by the board of administration pursuant to the authority conferred by chapter 257 are payable only out of these special funds, therefore no debts arise against the state on account of such contracts. *To our minds the fact that the dormitory income goes into the so-called institutional funds and not into the state treasury can make no difference.* Whether paid into the treasury or not, *this income* is nevertheless the *property* of the state and is used in the support and maintenance of the several institutions."

But respondent calls attention to the very recent North Dakota case of Lang v. City of Cavalier, 228 N. W. 819. That case does not repudiate the prior decisions in the McMillan and Wilder Cases, but points out that in those cases property (income) theretofore belonging to the state was pledged to the payment of the bonds, whereas "in the instant case * * * no property of the city is pledged. * * * It is true that the city built and owns the distribution system, but, as it stands without a generating plant, *it is useless and without value.* The electrical energy must be procured somewhere, and, if the city itself sees fit to generate it without expense to the taxpayers in the manner contemplated by the contract, there is no reason why the net proceeds made available from the sale thereof should not be put into a special fund. By doing this no property of the city is pledged and no property of the city will be paid to the Fairbanks-Morse Company."

The logic of that part of the decision above quoted can not be successfully applied to the Watertown case. One cannot say of a plant costing $750,000, the net income from which in 1928 was $58,127.44, and a distribution system to build which bonds in the sum of $80,000 were issued and which are outstanding, that they are *useless and without value.* The facts also in the Cavalier Case and the Watertown case are fundamentally different. The contract made between the city of Cavalier and the Fairbanks-Morse Company in August contemplated that the city would furnish a building in which the Fairbanks-Morse Company would install the machinery and the city would furnish a distribution system. In September the electors of Cavalier voted bonds in the sum of $16,000 to build this building and distribution system. The electors of Watertown have had no such opportunity to approve, ratify, or reject.

It would serve no useful purpose to further review other cases which follow Joliet v. Alexander, supra. Among the many are Lobdell v. City of Chicago, 227 Ill. 218, 81 N. E. 354; State v. Board of Trustees, 148 Wash. 126, 268 P. 862, 864; City of Santa Cruz v. Wykes (C. C. A.) 202 F. 357. Under the holdings of all these cases, the proposed revenue bonds would constitute a debt of the city of Watertown.

But there are authorities which take an opposite view. Although cited by respondents in support of their contention that

these bonds do not create a debt within the meaning of section 4 of article 13 of our State Constitution, the cases so cited are entitled to careful consideration if they aid in the solution of the statutory problem.

Counsel for respondents cite with confidence City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004, heretofore mentioned. It might well be surmised that counsel for respondent city had that decision before them in drafting Ordinance C-31, in determining the recitals in the bonds, in preparing the findings, conclusions, and judgment of the trial court. Much of the language is identical. But the statutory authority for the Kentucky ordinance and the statutory authority for the Watertown ordinance are far from identical. The city authorities of Bowling Green acted under the express authority of a twenty-one section act to "authorize cities * * * to acquire water works and to issue bonds, therefore, payable from the revenues of such works," being chapter 133, Kentucky Acts 1926. This act required no assent of the voters. The Kentucky court cites as authority Fox v. Bicknell, 193 Ind. 537, 141 N. E. 222. The opinion in that case discloses that the Indiana Legislature had, by Acts 1921, c. 96, provided for the acquisition of waterworks plants to be paid for by bonds payable solely and exclusively from the income of the plant purchased. The Bicknell Case did not involve the pledging of existing income from an existing plant to pay for the enlargement of the plant. The Kentucky court also cites two Washington cases. Both were decided after section 697, Hill's Gen. Stat., was enacted as the Act of March 26, 1890, and more recent Washington decisions of the Washington court have the statutory basis of Session Laws 1909, p. 584, § 4, and Rem. Comp. Stat. § 9491. As to the importance of statutory authority to pledge existing income, see State v. Board of Trustees, 148 Wash. 126, 268 P. 862, 864.

Counsel for respondents quote from Searle v. Town of Haxtun, 84 Colo. 494, 271 P. 629. That case cites with approval the Kentucky and Washington decisions heretofore commented upon, and follows Shields v. Loveland, 74 Colo. 27, 218 P. 913, 916. In that case, the people of Loveland had, at two elections, authorized the issue of bonds in the sum of $128,000 to construct an electric light plant. The city council proposed to issue $300,000 additional bonds payable only out of the revenue derived from the

plant without submitting the bond issue to the people. The Colorado court held that the $300,000 was not a "debt" within the meaning of its Constitution and statutes. It says: "The definitions of the word 'debt' are many, and depend on the context and general subject with reference to which it is used. 17 C. J. 1371. Its meaning in the sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. *The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay. Nor are these bonds a technical debt. Nothing is my debt unless a judgment for its amount can be recovered against me upon it.*"

The italics in the above quotation are our own. Referring to the language italicized, if the city of Loveland had given to the holders of those bonds all the assurances given by the city of Watertown by Ordinance C-31, it is difficult to see what practical difference it would have made in the city's financial condition which particular fund was debited when the $300,000 was paid to the bondholders, nor what difference it would have made therein whether the $300,000 were paid by city cash, by city property, or by existing established income of the city. Why speculate as to whether such an obligation is technically a debt of the city if the city has to pay it or lose its property of equal value? How can one say that the money is not to be borrowed on the credit of the corporation when the corporation so fully assures its payment. "Credit" has various meanings and even more various definitions. Among these are the following: The word "credit" comes from the Latin word "credere," to trust, and may be said to imply ability by reason of property or estates to make a promised payment. In re Ford (D. C.) 14 F. (2d) 848. It (credit) may be given because of the reputation or representations of solvency or honesty of the borrower or because of tendered or approved security. Lucas v. People, 75 Ill. App. 662, 665.

No useful purpose would be served by a further review of cases. Without legislative sanction, respondents are attempting to do that which cities in other states have done only after obtaining authority from their Legislatures. But respondents contend that

they possess implied power to issue these bonds without the approval of the electors. On the question of implied power to issue bonds, McQuillin, Mun. Corp. (2d Ed.) vol. 6, p. 134, § 2437, contains the following: "Some decisions have held that the express power conferred on a municipality to purchase property or erect buildings carries with it the power to issue bonds for the cost, and that is the law today, it seems in some states, although the weight of authority and the tendency of the later decisions is to the contrary."

But, inasmuch as the Legislature, in response to the constitutional mandate, has expressly provided by sections 6413-6432, Rev. Code 1919, the terms and conditions of bonds to be issued when money is borrowed on the credit of the city, why resort to implied power unless it be to avoid the wholesome provisions of section 6413, which requires submission to the electors. In Spangler v. City of Mitchell, 35 S. D. 335, 152 N. W. 339, 341, Ann. Cas. 1918A, 373, this court, after reviewing the growth of section 4, art. 13, Const., says: "It is clear, therefore, that the city without a vote may incur indebtedness within the 5 per cent limitation for any municipal purpose when authorized by a law which is not in conflict with any other provision of the Constitution, *except that it may not issue bonds without such vote.* Section 1229, subd. 5, Pol. Code."

This subdivision is the source of section 6413, Rev. Code 1919. For this court now to say a city council may borrow money on the credit of the corporation and issue bonds therefor without complying with the provisions of section 6413 is to give a technical narrowness to its language. It is true that respondents do not contend that section 6413 applies; their contention being that that section applies only to bonds payable from tax levies. Section 6998, Rev. Code 1919, is as follows: "Whenever any city * * * shall issue *any* bonds, except municipal bonds issued in lieu of special assessment certificates, at or before the time of so doing, the governing body thereof shall, by ordinance or resolution, provide for the levying of an annual tax sufficient to pay the interest and also the principal thereof when due."

Ignoring the possibility that section 6998 is also violated by Ordinance C-31, what is there in section 6413 which entitles respondents to say that it applies only to bonds payable from tax levies? It does not so state.

In this case counsel for appellant concede that respondent officers and councilmen of respondent city are representative business and professional men of that city, men of unquestioned integrity and ability; that respondents may have good reason from a business standpoint for attempting to carry out this program of extension. The growth of the plant's net earnings gives support to respondents' plan: $11,980.84 in 1924; $20,034.58 in 1925; $22,238.32 in 1926; $25,229.72 in 1927; $58,127.44 in 1928. The gross business was larger and the expense was less in 1928 than in 1927. Whereas the municipal plant formerly supplied 75 per cent of the electrical energy used in Watertown, now it has no competitor in a natural monopoly whereby consumers of electrical energy must buy from the municipal plant. On the other hand, the first electric light plant bonds, approved by vote of the electors, were issued on January 1, 1920. On July 1, 1929, a total of $777,000 of electric light plant and distribution system bonds were outstanding, all due by September 1, 1944, with $189,675.38 in the sinking fund.

But appellant contends and with this contention we agree, that, under our law, the decision as to whether bonds shall issue is placed with the electors, who, as taxpayers or consumers, must bear the responsibility and the burden. Our concern is not the profitableness of the method of finance chosen by these business men, nor whether it might legally have been used by a private corporation; we are concerned with the power of officers of a public corporation to employ the method of finance attempted, however profitable it might prove. On this point Abbott's Mun. Corp. vol. 1, p. 371, § 169, contains the following: "Borrowing money and issuing bonds, notes and bills as a rule are acts germane to the carrying on of the business of a private corporation. This is not true of public corporations. The ends for which they are organized or created are essentially different and in a board sense the power to issue bonds for moneys borrowed is not included among the ordinary powers of such organizations. They are governmental agencies or bodies of limited powers and the rule of strict construction withholds a right or denies a power when it does not clearly exist or is not expressly given. The power to borrow money and to issue bonds by the state or any of its divisions is a legislative one. It can be exercised by the proper legislative body

of the state, or if that body so elects, delegated in its performance to such subordinate agencies as it may select, but limited by constitutional provisions if such are given."

■■ Respondents are attempting to do that for which they have no statutory authority, either expressly given nor clearly implied, when they disregard the plain terms of section 6413. For that reason Ordinance C-31 and the bonds proposed to be issued thereunder are invalid. It is not necessary therefore to pass upon the other grounds of invalidity urged by appellant.

The judgment and order appealed from are reversed.

MISER, C., sitting in lieu of CAMPBELL, J., who has deemed himself disqualified.

POLLEY, J., concurs.

BURCH, J. (concurring specially). I concur in reversing the judgment. It seems to me, however, that there is one issue decisive of the case, and that it is unnecessary to decide any other. The city of Watertown is seeking to have the bonds described in Judge MISER'S opinion declared valid. For convenience I shall refer to them as revenue bonds. Respondents do not claim that these bonds are of a character mentioned in section 6413, Rev. Code 1919, or that there is any statutory authority for issuing them. It is respondents' contention that they may be issued without express authority in the Constitution or the statutes of the state. They rely upon implied power. In their brief they say "the respondents' position is that the City of Watertown having been expressly given the power to own, operate and maintain the electric plant thereby possesses the power to do such things as are necessary and reasonably pertinent to the operation and maintenance of such plant." They contend that a municipality given an express power has implied power to do those things necessary to the exercise of such express power. To meet this contention it seems to me unnecessary to consider whether or not the bonds constitute an indebtedness against the municipality. The case of City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004, involved a very different situation. In that case the bonds sought to be issued were issued under statutory authority. But such bonds with other indebtedness against the city of Bowling Green exceeded the statutory limitation prescribed by the Constitution of Kentucky, and

the question there was, Did such bonds create an indebtedness within the meaning of the Constitution limiting municipal indebtedness? That question is not involved in this case. The indebtedness here is well within the constitutional limitation. The case is not remotely in point on implied power. The discussion concerning the bonds as an indebtedness against the city seems to be for the purpose of classifying these revenue bonds and bringing them within the provisions of section 6413, Rev. Code 1919, and subsequent sections, governing their issuance. I do not think they can be so classified. That section authorizes the city to borrow money on the credit of the corporation and to issue its negotiable bonds therefor.

The argument that, if such bonds are a debt of the city, they are necessarily issued "on the credit of the corporation," is far from convincing to my mind. But, if the conclusion is sound, the reasoning is unfinished, for nothing is said as to their negotiability. Their negotiability is not so obvious as to need no mention. I do not believe the revenue bonds here sought to be issued are negotiable. Section 6413 does not authorize any borrowing of money except "on the credit of the corporation" nor the issuance of any bonds, except "negotiable bonds." To say that these bonds are within the terms and contemplation of section 6413 is to say that, if the procedure for issuing bonds authorized by that section is followed, the bonds will be valid. Respondents do not claim any authority under the section, and I see no reason why we should not take them at their word and decide the case on their theory, namely, that they have no power unless implied.

On this theory we must answer the question, is the power to issue these bonds implied as a necessary incident to the express power conferred upon cities to own, operate, and maintain lighting plants? To answer this question, the first thought in the process of reasoning is, Is it necessary to borrow money in order to successfully own, operate, and maintain the plant? If it is, then there ought to be power to do so. But, having reached this point, we find the Legislature has expressly conferred the power. There is no room for the implied power. The field is already covered by express provisions. No attempt has been made to use the express power to borrow money conferred by section 6413, and it does not appear that there is any compelling necessity for another.

Respondents argue that section 6413 is a grant of power and does not prohibit other powers. Conceded, but that does not help the matter. It is elementary that cities have only such powers as are granted to them. If to exercise the granted power some incidental power not expressly conferred is imperative, the grant may be broadened by construction to include the incident. Strictly speaking, it is the grant of power that is implied rather than the power itself. In Ruling Case Law, vol. 19, p. 768, § 75, speaking of implied powers, it is said: "Any fair and reasonable doubt concerning the existence of the power or any ambiguity in the statute upon which the assertion of the power rests, is to be resolved against the corporation and the power denied"—citing a large number of cases.

It may be that the city could more conveniently handle its plant if it were not restricted to one method of borrowing money. But if we hold for this reason that there is an implied power to issue these revenue bonds, then it logically follows that there is an implied power to raise money by any method known to business where more convenient. To so hold would be unwarranted legislation on the part of this court. As a practical convenience, but not as a necessity, it may be that the city should have as free a hand in managing a lighting plant as is given to private corporations. If so, the Legislature must be addressed, not this court. I am satisfied there is no legal authority for the issuance of the revenue bonds involved in this case, and therefore concur in reversing the judgment of the lower court.

BROWN, P. J. I dissent. Under Constitution, art. 13, § 4, the city of Watertown is authorized to incur indebtedness for general purposes to the amount of 5 per cent of the assessed valuation of its taxable property for the year preceding that in which such indebtedness is incurred. In addition it may incur indebtedness to the extent of 10 per cent of such assessed valuation for the purpose of providing water and sewerage, and in addition. 8 per cent of such assessed valuation for the purpose of constructing electric light or other lighting plant. The additional indebtedness authorized for water and sewerage and electric light purposes cannot be incurred unless authorized by a vote in favor thereof by a majority of the electors, but the general indebtedness of 5 per cent of the assessed valuation may be incurred

by action of the governing body without any vote of the electors in so far as the provisions of article 13, § 4, of the Constitution, are concerned. Spangler v. City of Mitchell, 35 S. D. 335, 152 N. W. 339, Ann. Cas. 1918A, 373. The assessed valuation of the city of Watertown for 1928, the year preceding that in which the indebtedness involved in this action was incurred, was $12,040,342. It could incur indebtedness for general purposes of $602,017, an additional indebtedness for water and sewerage purposes of $1,204,034, and for lighting plant $963,227. Its indebtedness did not reach the limit in any of these lines. Its entire floating indebtedness was in the neighborhood of $10,000, and it had more than six times the amount in cash on hand, so that floating indebtedness may be disregarded in any discussion of the case. Of its entire bonded indebtedness, $300,000 had been issued pursuant to a valid election for waterworks and sewerage purposes, and $697,000 pursuant to valid elections for electric light purposes, leaving only $133,750 of general indebtedness for which bonds had been issued. If to this we add $200,000 that had been authorized but not issued for an auditorium building, and the proposed $150,000 for electric light extension, the total general indebtedness bonds would amount to only $483,750, while under the 5 per cent limitation $602,017 might be incurred. It is therefore clear that the $150,000 additional indebtedness for light extension may be incurred without the necessity of any vote of the electors unless such vote is required by Rev. Code 1919, § 6413, which provides that "every municipal corporation shall have power to borrow money *on the credit of the corporation* for any authorized corporate purpose, within the constitutional limitations of municipal indebtedness, and to issue its negotiable bonds therefor * * * provided, that no bonds shall be issued under the provisions of this section, * * * unless at an election after ten days notice in a newspaper published in the municipality, * * * the legal voters of such city, by a majority of those voting at such election, shall determine in favor of issuing the same."

Since the corporation has power to incur the $150,000 indebtedness without vote of the electors except as controlled by section 6413, it follows that it may borrow the money by issuing bonds, unless the money is borrowed "on the credit of the corporation."

When bonds are issued to borrow money on the credit of the

corporation, it is made the duty of the governing body of the city at or before the time of so doing, by ordinance or resolution to provide for the levying of an annual tax sufficient to pay the interest and also the principal thereof when due. Rev. Code 1919, § 6998. Ordinance C-31, providing for the issuance of the $150,000 bonds, expressly provides, and the bonds themselves explicitly state, that they are payable solely from the municipal electric plant development fund created from the earnings of the plant, and that "the taxing power of said city is not pledged and shall never be used to pay either principal or interest on the bond or any part thereof." It therefore seems clear to me that the $150,000 bonds proposed to be issued for the extension of the light plant are not for money borrowed on the credit of the corporation, but are for money borrowed on the credit of the earnings of the light plant, and that no vote of the electors is necessary to authorize the governing body to issue such bonds.

The case of City of Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861, upon which the majority opinion seems largely to rely as authority for its conclusion, does not appear to me at all applicable to the facts in the case at bar. The question of when and under what circumstances a vote of electors is required before a city can issue bonds was not involved in that case at all. There the question was whether a contract for the extension of the existing waterworks system to be paid for by water fund certificates secured by a mortgage on the existing waterworks system and the extension would create a *debt* of the city. The Constitution of the state of Illinois prohibited the incurring of any debt by a city in excess of 5 per cent of its assessed valuation. The city of Joliet was already indebted largely in excess of the 5 per cent limit when it proposed the extension to be paid for by water fund certificates secured by a mortgage on the entire waterworks plant. The court, in City of Joliet v. Alexander, held that, although the holder of the certificates could not enforce their payment out of the general funds of the city, nevertheless, since such holders could foreclose whenever a default existed for ninety days and thus deprive the city of its property, the city by the terms of said contract incurred a *debt* in violation of the constitutional limitation of 5 per cent of the value of the taxable property. But in the instant case the question of whether or not the agreement to pay for the extension out

of the municipal electric plant development fund does or does not constitute *a debt* is not controlling, because the governing body of of the city of Watertown had authority to incur the entire proposed indebtedness without violating any constitutional provision, although no vote of the electors was had. After such indebtedness was incurred, the city, instead of having transgressed the constitutional limitation, was still more than $118,000 within the limitation. The majority opinion at the outset says: "Whether the indebtedness proposed to be created constitutes a debt within the meaning of that section of the Constitution [Article 13, § 4] is a question on which authorities differ. No useful purpose would be served in deciding that question if the ordinance and bonds are invalid as violating the statutes of the state, as appellant also contends."

After having thus designedly evaded a decision of the constitutional question, the opinion later on argues at great length that the proposed indebtedness does constitute such a debt, citing City of Joliet v. Alexander, supra, and other cases following that case in support of the argument, which it concludes with the statement, "Under the holdings of all these cases, the proposed revenue bonds would constitute a debt of the city of Watertown." But whether or not they would constitute a debt is not the question before us. for decision. If it be conceded that the proposed bonds constitute a debt, still the governing body had power to incur that debt and to issue bonds therefor without any election being held unless such bonds were issued for money borrowed *on the credit of the corporation.* I think it is plain that money is not borrowed on the credit of a municipal corporation unless it is loaned in reliance upon all resources of the corporation for payment. "The credit of an individual, is the trust reposed in him by those who deal with him; that he is of the ability to meet his engagements; and he is trusted, because through the tribunals of the country, he may be compelled to pay." Owen v. Branch Bank at Mobile, 3 Ala. 258, 267.

Webster's International Dictionary defines credit as "the relation existing between one person and another who trusts him to pay or render something in the future." The bondholders in the present case do not trust the city, they expressly renounce reliance on the city. They trust in the revenue of the light plant alone. If that fails, they cannot resort to other revenues of the city or

call upon the credit of the city to save them. Their money was not borrowed on the credit of the corporation. In the majority opinion it is said that, if the obligation of the city were to turn over to the bondholders the net income from an electric plant to be purchased with the proceeds of the bonds proposed to be issued, without any other promise to pay, it may well be doubted whether the provisions of section 6413 would apply thereto; and the opinion of the Supreme Court of North Dakota, in Lang v. City of Cavalier, 228 N. W. 819, 825, is quoted from to the effect that "the great weight of authority is to the effect that a municipality does not create an indebtedness within the purview of prohibitions against incurring indebtedness by purchasing property to be paid for wholly out of the income therefrom with no general liability."

But it is said in the instant case the entire obligation of the city is not simply to turn over to the bondholders the net income of property to be purchased with the proceeds of the proposed bonds; that the city, in addition to paying the income from the $150,00, agrees to seven further engagements, the first of which is, "A written promise to pay a sum certain in money out of a fund, the sufficiency of which the city assures." This seems to me an obvious misconstruction of the language of the bond. The city does not assure the sufficiency of the fund. In no event can any resources of the city other than the municipal plant development fund be called upon to make that fund sufficient to pay the bonds. Instead of assuring the sufficiency of the fund, the recitals in the bond assume the sufficiency of the fund, but, if that assumption should prove unfounded, the bondholder cannot call upon the city to make good the fund. He himself, in that event, agrees to stand the loss. The second such engagement is a pledge of the income of the original $750,000 plant and the third a pledge that the city will not use the net income of the $750,000, plant as it had heretofore been used to, to pay the bonds voted to construct it. These two engagements or promises are, in substance, one, and in my opinion constitute no objection to the authority of the governing body to issue the bonds. The $750,000 of bonds previously issued were issued pursuant to elections called for the purpose. An inseparable part of such issue was that the governing body should provide for the levying of an annual tax sufficient to pay the interest and also the principal thereof when due. Rev. Code 1919, § 6998. If the city

in fact in the past has taken the net income from the light plant and applied it in payment of the interest or principal of these bonds the city has just been donating that much to the taxpayers. It was under no obligation to apply the net income to the payment of the interest or principal of such bonds and thus relieve the taxpayers from the obligations imposed upon them by the ordinance providing for the annual tax sufficient to pay the interest and principal of the bonds. The city is under no obligation to continue this donation, and, if it now takes the income from the entire plant to provide for payment of the bonds issued for the extension, this does not constitute any forbidden diversion of the income from the original plant. If it should become necessary to take a portion or even the whole of the income from the entire plant in order to pay the principal and interest of the $150,000 bonds issued for the extension, and in consequence thereof the tax to provide a sinking fund for the $750,000 bonds had to be levied, as required by the provisions of Rev. Code 1919, § 6998, that would not constitute the levying of any tax either direct or indirect for the payment of the bonds issued for the extension.

Instead of taking any part of the net income of the original plant and applying it to the payment of interest or principal on the $750,000 bonds, the city council might have taken that entire net income and placed it in a "hope chest" until it had accumulated to an amount sufficient to pay for the entire proposed extension. No taxpayer would have had any ground for complaint nor any right to require such net income to be applied in payment of the $750,000 bonds or interest thereon instead of being so accumulated, and, if the city could have accumulated the fund in advance for the proposed extension from the net profits from the operation of the lighting plant, I can see no reason why it cannot also take the current and future net income for the same purpose. To buttress the third obstacle to the issuing of the bonds, section 6998 of the Code is cited in the majority opinion as follows: "Whenever any city * * * shall issue any bonds * * * the governing body thereof shall * * * provide for the levying of an annual tax sufficient to pay" them when due. The second set of asterisks in the foregoing quotation takes the place of a quite significant exception, which has been supplied by a change in the principal opinion, since this dissent was first written, the section reading, "Whenever any city

* * * shall issue any bonds, except municipal bonds issued in lieu of special assessment certificates," the governing body shall provide for the levying of an annual tax sufficient to pay the principal and interest of the bonds when due. In issuing bonds in lieu of special assessment certificates (that is, bonds which are not issued on the credit of the city but on the credit of a fund which is to be created from sources other than on the credit of the city), no sinking fund tax is to be levied. This section, instead of supporting the theory of the majority opinion, is antagonistic to it, for it shows that bonds may be issued by a city which are not issued on the credit of the corporation and which therefore may be issued without a vote of the electors. It is just possible that when our legislation for the government of municipal corporations was enacted municipal plant development bonds had not been heard of, but it is the boast of our law that it can adapt existing principles and rules to new situations, and the fact that section 6998 provides that municipal bonds may be issued in lieu of special assessment certificates to be paid out of a fund created by the special assessment, as to which bonds no sinking fund is provided, shows that bonds may be issued to be paid for out of a specific fund not provided by taxation, such as is the Watertown municipal plant development fund, and that for the payment of such bonds no sinking fund is to be provided, no credit of the city to be resorted to for their payment, and that such bonds, not being issued on the credit of the corporation, may be issued without the necessity of a vote of the electors. See Shields v. City of Loveland, 74 Colo. 27, 218 P. 913, and Searle v. Town of Haxtum, 84 Colo. 494, 271 P. 629, holding that "revenue bonds" such as those involved in the instant case are not a "debt" of the city issuing them.

The fourth obstacle to the legality of the bond issue urged in the majority opinion is "an obligation to charge customers rates high enough to insure prompt payment of the favored revenue bonds." But the ordinance expressly provides that all rates shall be reasonable and just and within the limits prescribed by law. There is no obligation and no power under the ordinance to charge unreasonable rates, and, if the so-called "favored revenue bonds" cannot be paid from the development fund provided by reasonable rates, the bondholders must bear the loss. The fifth obstacle mentioned is that the city agrees to pay reasonable rates for city ser-

vices from moneys raised by taxation. There is certainly nothing unjust in this, and, if the light plant were owned by a private corporation, the city would certainly have to pay for city services, and might have very little to say as to whether the rates they were required to pay were reasonable or unreasonable. A sixth obstacle seen by the majority is the clause binding the city not to sell or dispose of the municipal electric plant until all the proposed bonds shall have been paid unless provision shall have been made for the payment of the bonds and the interest in full. It is said that this conflicts with Rev. Code § 6169, subd. 19, as amended by chapter 242 of the Laws of 1925, which reserves to the electors of the city the unlimited right to determine whether and when to sell or dispose of any plant furnishing light or power. As I read section 6169, it does not reserve to the electors the right to determine when or whether to sell. It rather gives them the right to forbid or authorize a sale, but not to sell; nor is it at all clear that the governing body could be compelled to make a sale even if authorized by a vote. In any event the right of the electors to determine whether to sell the plant is in no manner interfered with. It is merely provided that, if a sale should be proposed, it should not be carried out without making provision for the payment of the bonds and interest. This is nothing more than a provision that, in case a sale should be made, the city would deal honestly and fairly with the bondholders, a condition that we may assume the electors would willingly provide for in case they should by a vote authorize a sale of the plant. The seventh and last obstacle enumerated in the majority opinion to the legality of the proposed bond issue is "an agreement that a receiver may be appointed with a delegation of power to such receiver to charge and collect rates sufficient to provide for the payment of these favored bonds." Again the majority overlook the fact that, should a receiver become necessary, he is only authorized to charge and collect rates sufficient to provide for the payment of the bonds and coupons "in conformity with this ordinance"; that is, he can only charge and collect reasonable rates.

Furthermore, I think, in view of the statement made near the close of the majority opinion, the possibility of a receiver is too remote for serious consideration. It is conceded that the governing body of respondent city is composed of business men of unques-

tioned integrity and· ability; that the growth of the net earnings of the plant gives support to respondents' plan; that these net earnings have increased from about $12,000 in 1924 to more than $58,000 in 1928. This has been accomplished during a period when the city plant had competition with a private plant, which competition is now eliminated, in consequence of which the gross business is now larger and the expense less than it has been formerly.

Extraordinary decline in the business capacity and integrity of the members of the governing body would have to take place before a receivership would come within the range of practical possibility. It is hardly supposable that a community that has had the intelligence to elect in the past a governing body composed of members who have made such a success of the operation of its public utilities as is shown in this case will be likely within the period that the bond proposed to be issued will run to elect others who will make such a failure of the operation of those utilities that a receiver will have to be appointed to operate them.

The general plan of our ·municipal corporation system contemplates that municipal government shall be representative; direct government by all of the inhabitants is not in general provided for. And, where there is no provision for a vote of the electors, the governing body has authority to carry out any municipal project within the authorized powers of the corporation without the necessity of taking any vote of the electors on the subject. The governing body has authority to borrow money within the 5 per cent limit without any vote of the electors unless where it borrows the money on the credit of the corporation. I am satisfied that the proposed bonds in this case are not issued for money borrowed or to be borrowed on the credit of the corporation and therefore no vote of the electors is necessary to authorize their issue.

SHERWOOD, J. I concur in Judge BROWN'S dissenting opinion.